IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

JANE PORTER,                    )
                               )
          Plaintiff,            )
                               )
     v.                         )  Case No. 07-00461-CV-W-REL
                               )
CITY OF LAKE LOTAWANA,          )
MISSOURI, and                   )
ART VAN HOOK, in his            )
individual and official         )
capacity,                       )
                               )
          Defendants.           )

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT;
GRANTING IN PART AND DENYING IN PART
DEFENDANT VAN HOOK'S MOTION FOR JUDGMENT ON THE PLEADINGS**

Before the court is a motion for summary judgment filed by
defendants City of Lake Lotawana and Art Van Hook (Doc. Nos. 61,
62). Defendants move for summary judgment on all causes of
action alleged in plaintiff's complaint, and the City of Lake
Lotawana moves for summary judgment on its counterclaim against
plaintiff for breach of fiduciary duty only as to the issue of
liability. I find that (1) there is no genuine issue as to any
material fact with regard to plaintiff's claims of age
discrimination, sex discrimination, retaliation, Missouri Human
Rights Act violations, or defamation as to defendant Lake
Lotawana; (2) there is no genuine issue as to any material fact
with regard to plaintiff's claims of Missouri Human Rights Act
violations, wrongful termination, or defamation as to defendant
Art Van Hook; (3) there remains a genuine issue of material fact

as to plaintiff's claim of wrongful termination against defendant
Lake Lotawana; and (4) there remains a genuine issue of material
fact as to defendant Lake Lotawana's counterclaim for breach of
fiduciary duty against plaintiff.  Therefore, the motion for
summary judgment will be granted as to plaintiff's claims of age
discrimination, sex discrimination, retaliation, Missouri Human
Rights Act violations, and defamation as to defendant Lake
Lotawana; granted as to plaintiff's claims of Missouri Human
Rights Act violations, wrongful termination, and defamation as to
defendant Art Van Hook; denied as to plaintiff's claim of
wrongful termination as to defendant Lake Lotawana; and denied as
to Lake Lotawana's counterclaim of breach of fiduciary duty.

Also before the court is defendant Van Hook's motion for
judgment on the pleadings (Doc. No. 28).  Plaintiff concedes that
defendant Van Hook is entitled to judgment on the pleadings on
Counts I, II, and III of her complaint.  I find that the current
state of Missouri law holds that the Missouri Human Rights Act
imposes individual liability in the event of discriminatory
conduct; therefore, defendant's motion for judgment as to Count
IV will be denied.

## I.    BACKGROUND

On June 25, 2007, plaintiff filed a complaint against the
City of Lake Lotawana and Art Van Hook, both in his individual
and official capacity, after being terminated from her position

as City Clerk.  Specifically, plaintiff alleges the following claims against both defendants: (1) violations of the Age Discrimination in Employment Act ("ADEA"); (2) sex discrimination in violation of Title VII; (3) retaliation; (4) violations of the Missouri Human Rights Act ("MHRA"); (5) wrongful termination; and (6) defamation.  On March 28, 2008, the City of Lake Lotawana filed a counterclaim against plaintiff alleging breach of fiduciary duty.

On June 30, 2008, defendant Van Hook filed a Motion for Partial Judgment on the Pleadings and Suggestions in Support (Doc. No. 28).  Plaintiff filed suggestions in opposition on July 29, 2008 (Doc. No. 35).  On August 20, 2008, defendant Van Hook filed reply suggestions to his original motion (Doc. No. 105).

On September 19, 2008, defendants filed a motion for summary judgment and suggestions in support (Doc. Nos. 61, 62). Defendants argue that (1) the ADEA does not apply because Lake Lotawana never employed 20 or more employees, (2) plaintiff cannot establish a prima facie case of age discrimination because she cannot show that she met the legitimate performance expectations, (3) defendant has articulated a legitimate, nondiscriminatory reason for its action and plaintiff cannot establish pretext, (4) plaintiff was not similarly situated to the Police Chief or the Public Works Director, (5) plaintiff cannot establish a gender discrimination claim because she was

3

replaced with a female, (6) plaintiff cannot establish a "protected activity", (7) Lake Lotawana has sovereign immunity, and (8) plaintiff cannot establish a claim of defamation because the publications were not false.

Plaintiff filed suggestions in opposition on November 24, 2008 (Doc. No. 71). Plaintiff argues that (1) she was terminated in violation of Lake Lotawana's City Code, (2) Lake Lotawana waived its immunity by purchasing indemnity insurance, (3) plaintiff was terminated without progressive discipline which is a violation of due process, (4) plaintiff's letter to the City Attorney complained of discrimination five days before she was terminated, (5) the Board of Aldermen and the mayor cannot agree on the basis for plaintiff's termination, and (6) a political subdivision of a state does not have a numerical restriction.

On December 24, 2008, defendants filed a reply (Doc. No. 74), reiterating the arguments in their motion for summary judgment.

## II. STANDARDS

### A. STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure permits summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

4

material fact and that the moving party is entitled to judgment as a matter of law."

The key to determining whether summary judgment is proper is ascertaining whether a genuine issue of material fact exists. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party. <u>Am. Acad. of Family Physicians v. United States</u>, 75 A.F.T.R.2d 95-1709 (W.D. Mo. 1995), <u>aff'd</u> 91 F.3d 1155 (8th Cir. 1996). The party moving for summary judgment has the burden of proving that these requirements for summary judgment have been met. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970).

In a summary judgment analysis, a court must first consider whether there are any issues of fact. If the only issues are issues of law, then summary judgment is appropriate. <u>Disesa v. St. Louis Cmty. Coll.</u>, 79 F.3d 92, 94 (8th Cir. 1996). If issues of fact are raised, a court must consider whether these issues are material to the outcome of the case. Materiality is identified by the substantive law that is to be applied. <u>Anderson</u>, 477 U.S. at 248. Factual disputes that are collateral to the substantive law will not preclude summary judgment. <u>Id</u>.

5

In addition to the requirement that a dispute of fact be material, the dispute must also be genuine. A dispute of fact is considered genuine if the non-moving party has produced sufficient evidence such that a reasonable jury could return a verdict for that party. Id. at 249. When considering a motion for summary judgment, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor. Id. at 255. If the evidence submitted by the non-moving party is merely colorable or is not significantly probative, then summary judgment may be granted. Id. at 249-50.

Where the party moving for summary judgment does not bear the burden of proof at trial, that party must show "that there is an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). This burden is met when the moving party identifies portions of the record demonstrating an absence of a genuine issue of material fact. Id. at 323. If the moving party meets the requirement, the burden shifts to the non-moving party who must set forth specific facts showing that there is a genuine issue for trial. Anderson, 477 U.S. at 248. The trial judge then determines whether a trial is needed -- "whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.

6

*B.*    *STANDARD FOR JUDGMENT ON THE PLEADINGS*

"Judgment on the pleadings is appropriate only when there is no dispute as to any material facts and the moving party is entitled to judgment as a matter of law." Wishnatsky v. Rovner, 433 F.3d 608, 610 (8th Cir. 2006).  Accordingly, review of a motion for judgment on the pleadings is conducted according to the standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.  Westcott v. City of Omaha, 901 F.2d 1486, 1488 (8th Cir.1990); see also Ashley County, Ark. v. Pfizer, Inc., No. 08-1491, 2009 WL 17992, at *2 (Jan. 5, 2009).

Rule 12(b)(6) provides that a claim may be dismissed for failure to state a claim.  In considering a Rule 12(b)(6) motion, the court must accept the "allegations in the complaint as true and draw all reasonable inferences in favor of the nonmoving party." Coons v. Mineta, 410 F.3d 1036, 1039 (8th Cir. 2005).  A motion to dismiss must be granted if the complaint does not contain "enough facts to state a clam to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007)(abrogating "no set of facts" standard for Rule 12(b)(6) found in Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  In other words, the complaint's factual allegations "must be enough to raise a right to relief above the speculative level" to avoid dismissal.  Id. at 1965.

7

*III. UNCONTROVERTED FACTS*

Below, typed in bold, are the facts offered by defendants that I find to be uncontroverted by the record before me.

1. **Jane Porter's complaint contains one count against the City of Lake Lotawana and Art Van Hook alleging age discrimination in violation of the Age Discrimination in Employment Act ("ADEA").**

Plaintiff does not dispute this fact.

2. **Jane Porter's complaint contains one count against the City of Lake Lotawana and Art Van Hook alleging gender discrimination in violation of Title VII of the Civil Rights Act of 1964.**

Plaintiff does not dispute this fact.

3. **Jane Porter's complaint contains one count against the City of Lake Lotawana and Art Van Hook alleging retaliation for allegedly reporting discriminatory acts that violated the ADEA, Title VII, the MHRA and Lake Lotawana city codes.**

Plaintiff does not dispute this fact.

4. **Jane Porter's complaint contains one count against the City of Lake Lotawana and Art Van Hook alleging age discrimination, gender discrimination and retaliation in violation of the MHRA.**

Plaintiff does not dispute this fact.

8

5.  Jane Porter's complaint contains one count against the City of Lake Lotawana and Art Van Hook alleging wrongful termination in violation of Missouri state law.

Plaintiff does not dispute this fact.

6.  Jane Porter's complaint contains one count against the City of Lake Lotawana and Art Van Hook alleging defamation in violation of Missouri state law.

Plaintiff does not dispute this fact.

7.  Jane Porter filed one charge of discrimination on September 15, 2006, with the Missouri Commission on Human Rights ("MCHR").

Plaintiff does not dispute this fact.

8.  Jane Porter's one charge of discrimination alleged discrimination based upon age, sex, retaliation and hostile work environment.

Plaintiff does not dispute this fact.

9.  The only respondent alleged to have discriminated against Jane Porter in the charge of discrimination was the City of Lake Lotawana.

Plaintiff disputes this fact, maintaining that the charge of discrimination filed by plaintiff was asserted against the City of Lake Lotawana and Art Van Hook.  Consistent with the reasoning

9

set forth in my order on defendant Van Hook's Motion for Judgment on the Pleadings, I find this fact to be uncontroverted.

**10. Jane Porter's charge of discrimination contains a section where she is to state, with reference to her charges of discrimination, "The Particulars Are (if additional space is needed, attach extra sheet(s)."**

Plaintiff disputes this fact, arguing that the document must be read as a whole. Defendants support this fact by citing plaintiff's charge of discrimination. I have reviewed the charge of discrimination and agree that there is a section entitled "The Particulars Are." This fact is uncontroverted.

**11. In describing the particulars of her discrimination charges, Jane Porter never uses the word age.**

Plaintiff disputes this fact, arguing that the document must be read as a whole. Defendants support this fact by citing plaintiff's charge of discrimination. I have reviewed the charge of discrimination and agree that the word "age" is not used in the section entitled "The Particulars Are." This fact is uncontroverted. I do note, however, that plaintiff states on the first page of the charge of discrimination that she is alleging discrimination based on age, <u>inter</u> <u>alia</u>.

**12. In describing the particulars of her discrimination charges, Jane Porter never references the age of anyone alleged to have discriminated against her.**

10

Plaintiff disputes this fact, arguing that the document must be read as a whole.  Defendants support this fact by citing plaintiff's charge of discrimination.  I have reviewed the charge of discrimination and find there to be no references to the age of anyone alleged to have discriminated against her.  This fact is uncontroverted.

**13.  In describing the particulars of her discrimination charges, Jane Porter never references the age of any employee who replaced her or who might be similarly situated.**

Plaintiff disputes this fact, arguing that the document must be read as a whole.  Defendants support this fact by citing plaintiff's charge of discrimination.  I have reviewed the charge of discrimination and find there to be no references to the age of any employee who replaced her or who might be similarly situated.  This fact is uncontroverted.

**14.  In describing the particulars of her discrimination charges, Jane Porter never references any derogatory comment based upon her age.**

Plaintiff disputes this fact, arguing that the document must be read as a whole.  Defendants support this fact by citing plaintiff's charge of discrimination.  I have reviewed the charge of discrimination and find there to be no references to derogatory comments based upon age.  This fact is uncontroverted.

11

**15.  In describing the particulars of her discrimination charges, Jane Porter never uses the words gender or sex.**

Plaintiff disputes this fact, arguing that the document must be read as a whole.  Defendants support this fact by citing plaintiff's charge of discrimination.  I have reviewed the charge of discrimination and agree that the words "gender" and "sex" are not used in the section entitled "The Particulars Are."  This fact is uncontroverted.  I do note, however, that plaintiff references being terminated because she was a female in this section. Plaintiff also states on the first page of the charge of discrimination that she is alleging discrimination based on sex, inter alia.

16.  In describing the particulars of her discrimination charges, Jane Porter never references the gender of anyone alleged to have discriminated against her.

Plaintiff disputes this fact, arguing that the document must be read as a whole.  Defendants support this fact by citing plaintiff's charge of discrimination.  I have reviewed the charge of discrimination and, particularly, the section entitled "The Particulars Are."  In this section, plaintiff uses the pronoun "he" to refer to the Mayor.  I find that this fact remains controverted.

12

17.  In describing the particulars of her discrimination charges, Jane Porter never references any derogatory comment based upon her gender.

Plaintiff does not dispute this fact.

18.  In describing the particulars of her discrimination charges, Jane Porter never references any sexually suggestive comments or inappropriate touching.

Plaintiff does not dispute this fact.

19.  In describing the particulars of her discrimination charges, Jane Porter does reference the gender of two supposedly similarly situated employees – the male police chief (and presumably the male public works director).

Plaintiff does not dispute this fact.

20.  With regard to these two supposedly similarly situated employees, Jane Porter states in the particulars of her discrimination charges: "I have been consistently treated differently from the other two male department heads.  For one example the police chief, a male department head, received both paid vacation and compensatory time.  I was denied the payment of both vacation and compensatory time because I was a female employee.  Additionally, neither of the other two department heads was investigated.  I believe that I was terminated because I was a female."

13

Plaintiff does not dispute this fact.

**21. In describing the particulars of her discrimination charges, Jane Porter never claims that she reported age discrimination.**

Plaintiff disputes this fact, arguing that the document must be read as a whole. Defendants support this fact by citing plaintiff's charge of discrimination. I have reviewed the charge of discrimination and find plaintiff did not claim she reported age discrimination; rather, she claims she "reported to the City Attorney information adverse to the Mayor." This fact is uncontroverted.

**22. In describing the particulars of her discrimination charges, Jane Porter never claims that she reported gender discrimination.**

Plaintiff disputes this fact, arguing that the document must be read as a whole. Defendants support this fact by citing plaintiff's charge of discrimination. I have reviewed the charge of discrimination and find plaintiff did not claim she reported gender discrimination; rather, she claims she "reported to the City Attorney information adverse to the Mayor." This fact is uncontroverted.

**23. With regard to engaging in any purportedly protected activity, Jane Porter states in the particulars of her discrimination charges: "I reported to the City Attorney**

14

information adverse to the Mayor. As a result of taking sick leave and reporting information to the City Attorney I received an adverse employment action and believe that I was retaliated against. Because of the information that I know and that I have disclosed, I was treated adversely and believe that it was the reason I was ultimately terminated."

Plaintiff does not dispute this fact.

24. On April 10, 2007, the Equal Employment Opportunity Commission ("EEOC") issued a Notice of Right to Sue letter to Jane Porter.

Plaintiff does not dispute this fact.

25. On March 27, 2007, the MCHR issued a Notice of Right to Sue letter to Jane Porter.

Plaintiff does not dispute this fact.

26. Jane Porter is a female.

Plaintiff does not dispute this fact.

27. Jane Porter was born on January 5, 1949, and is presently 59 years of age.

Plaintiff does not dispute this fact.

28. While Jane Porter was working in Lake Lotawana, her employer was the City of Lake Lotawana and no one else.

Plaintiff does not dispute this fact.

29.  Art Van Hook was the mayor of the City of Lake Lotawana on July 31, 2006.  He was born on October 28, 1944, and is presently 63 years of age.

Plaintiff does not dispute this fact.

30.  Tom Myers was a member of the City of Lake Lotawana Board of Aldermen on July 31, 2006. He was born on October 26, 1938, and is presently 69 years of age.

Plaintiff does not dispute this fact.

31.  Rob Reid was a member of the City of Lake Lotawana Board of Aldermen on July 31, 2006, and also served as mayor pro tem. He was born on August 10, 1959, and is presently 49 years of age.

Plaintiff does not dispute this fact.

32.  Mark Pfefferkorn was a member of the City of Lake Lotawana Board of Aldermen on July 31, 2006.  He was born on February 3, 1955, and is presently 53 years of age.

Plaintiff does not dispute this fact.

33.  Jim Kennard was a member of the City of Lake Lotawana Board of Aldermen on July 31, 2006.  He was born on February 13, 1936, and is presently 72 years of age.

Plaintiff does not dispute this fact.

16

34.  D. J. Harter was a member of the City of Lake Lotawana Board of Aldermen on July 31, 2006. He was born on September 26, 1942, and is presently 65 years of age.

Plaintiff does not dispute this fact.

35.  Lenda Harter was a member of the City of Lake Lotawana Board of Aldermen on July 31, 2006. She was born on January 4, 1944, and is presently 64 years of age.

Plaintiff does not dispute this fact.

36.  The City of Lake Lotawana first hired Jane Porter as a part-time clerk on September 9, 1996.

Plaintiff does not dispute this fact.

37.  The City of Lake Lotawana hired Jane Porter as a full-time employee in June of 1997.

Plaintiff does not dispute this fact.

38.  Beginning in June of 1997, Jane Porter held the position of business manager.

Plaintiff does not dispute this fact.

39.  In 1998 Jane Porter also became the city clerk and court clerk.

Plaintiff does not dispute this fact.

40.  In 1999 Jane Porter was told she could carry the title of city administrator even though the City of Lake Lotawana had no ordinance to that effect.

17

Plaintiff does not dispute this fact.

**41.   In approximately 2004 the court clerk position changed to court administrator for Jane Porter.**

Plaintiff does not dispute this fact.

**42.   Beginning in approximately 2004 Jane Porter shared some of the duties as zoning administrator.**

Plaintiff does not dispute this fact.

**43.   Jane Porter also worked as secretary to the Board of Adjustment.**

Plaintiff does not dispute this fact.

**44. Jane Porter also worked as secretary to the Planning Commission.**

Plaintiff does not dispute this fact.

**45.   Art Van Hook was elected mayor of the City of Lake Lotawana in 2001.**

Plaintiff does not dispute this fact.

**46.   Jane Porter applied for two other positions during the entire time she was employed by Lake Lotawana, once in 2000 or 2001 and a second time in 2003 or 2004.**

Plaintiff does not dispute this fact.

**47.   The reason Jane Porter applied for these two jobs is because she perceived them to be better positions and not because**

of any dissatisfaction with her job at Lake Lotawana, as she was generally satisfied and happy with her job at Lake Lotawana.

Plaintiff does not dispute this fact.

48. Rhonda Littrell is a female and was born on February 12, 1958. She is presently 50 years of age.

Plaintiff does not dispute this fact.

49. Rhonda Littrell is a grandmother.

Plaintiff does not dispute this fact.

50. Rhonda Littrell began working for the City of Lake Lotawana in July 1997.

Plaintiff does not dispute this fact.

51. Rhonda Littrell was hired by Jane Porter.

Plaintiff does not dispute this fact.

52. Jane Porter supervised Rhonda Littrell.

Plaintiff does not dispute this fact.

53. Toni Burgess is a female.

Plaintiff does not dispute this fact.

54. Toni Burgess was an employee of the City of Lake Lotawana.

Plaintiff does not dispute this fact.

55. Toni Burgess began working for the City of Lake Lotawana in 2005.

Plaintiff does not dispute this fact.

19

**56. In approximately January 2006, Rhonda Littrell and Toni Burgess [had] a meeting with Mayor Van Hook.**

Plaintiff does not dispute this fact.

**57. Rhonda Littrell and Toni Burgess had not planned to have this meeting with Mayor Van Hook.**

Plaintiff does not dispute this fact.

**58. This meeting occurred when Rhonda Littrell looked at Toni Burgess and said, "I've had enough of this. I'm going to go in and talk to the mayor. Do you want to go with me, and [Toni Burgess] said yes."**

Plaintiff does not dispute this fact.

**59. Rhonda Littrell's goal for this meeting with Mayor Van Hook was to see improvement in the workplace and improvement in Jane Porter's performance.**

Plaintiff does not dispute this fact.

**60. Rhonda Littrell and Toni Burgess "went to talk to Art Van Hook because basically [the two of them] were fed up with Jane Porter not showing up to work."**

In support of this fact, Defendants cite page 34, lines 9-18 of Ms. Littrell's deposition:

    Q:   You and Toni went to the mayor to talk to the mayor,
         Art Van Hook, about Jane Porter's work performance?
    A:   Uh-huh.
    Q:   Tell me about that conversation.
    A:   Basically December or January - - December '05, I think
         it was more in the time frame of January of '06,

20

sometime, we went to talk to Art Van Hook because
basically we were fed up with Jane Porter not showing
up to work.

Plaintiff disputes this fact, stating that Art Van Hook
described plaintiff as "overworked," never personally witnessed
any of the behavior Ms. Littrell and Ms. Burgess complained
about, and believed any problems were associated with the "Court"
rather than the daily routine in the office (Van Hook Depo.,
39:19-40:17, 43:21-23, 49:12-52:22). The evidence cited by
plaintiff does not controvert the fact that Ms. Littrell and Ms.
Burgess spoke to defendant Van Hook about plaintiff. I find this
fact to be uncontroverted.

61. Jane Porter would frequently miss work during the
latter part of 2005 and the early part of 2006.

In support of this fact, defendants cite page 35, lines 4-23
of Ms. Littrell's deposition:

    A:  I talked to Art Van Hook about Jane's general work
        performance.
    Q:  Had you talked to Jane about her work performance
        before?
    A:  No.
    Q:  You and Toni went to the mayor to talk to the mayor,
        Art Van Hook, about Jane Porter's work performance?
    A:  Uh-huh.
    Q:  Tell me about that conversation.
    A:  Basically December or January – – December '05, I think
        it was more in the time frame of January of '06,
        sometime, we went to talk to Art Van Hook because
        basically we were fed up with Jane Porter not showing
        up to work.
    Q:  You were fed up with Jane not showing up to work?
    A:  Uh-huh.
    Q:  You are not talking about court now?
    A:  Just – –

21

Plaintiff disputes this fact.  To controvert defendants'
proposed fact, plaintiff cites excerpts from her own deposition:

> Q: Okay.  In the last year of employment, what percentage
> of the time would you estimate you arrived to work by 8
> a.m.?
> A: Well, apparently you and I don't agree.  So I'm going
> to say 98 percent of the time, but . . .
> Q: Okay.  You don't recall problems being created because
> you were coming to work much later than 8 a.m.?
> A: No, sir, I don't.

(Porter Depo., 257:24-258:7).  This fact remains controverted.

**62.  Rhonda Littrell was tired of Jane Porter not being in
the office to do her job.**

In support of this fact, defendants cite page 64, line 25
through page 65, line 21 of Ms. Littrell's deposition:

> Q: It sounds like to me, correct me if I'm wrong, that
> towards the latter part of '05, early part of '06, you
> were starting to be resentful of Jane Porter?
> A: Not really resentful.
> Q: You felt like - - you told me earlier you felt like you
> were doing her job?
> A: Yeah, basically I was doing her job.
> Q: You couldn't tell me what your job responsibilities
> were when I asked you what they were.
> A: Well - -
>           MR. MIZNER: I'm not sure there is a question here.
> Q: (BY MR. POWELL) Were you resentful of Jane or not, I
> guess that's my question?
> A: No.
> Q: How would you characterize your feelings toward her at
> that time?
> A: Toward her at that time, I didn't have any ill feelings
> towards Jane.  I was just tired of her not being in the
> office to do her job.

Plaintiff disputes this fact.  To controvert defendants'
proposed fact, she cites portions of her own deposition:

22

Q:  Okay.  Are you aware of any complaints that were made
    while you were still employed about you not coming to
    work in a timely manner in the morning?
A:  No, sir.
Q:  Were you ever confronted about any problems that exist
    with your showing up to work on time in the morning?
A:  The 1st of February in 2006 the mayor called me in and
    patted me on the hand and said, you know, you do such a
    great job, but he said, you need to make sure people
    here know what to do, because when you're late, they
    don't know what to do.  And I said, Art, you know,
    Rhonda has worked for me for seven years.  Of course
    she knows what to do.  Well – – but it creates a
    problem.  I said, well, I'm sorry if it does, and – –
    and I'll try to do better in the future, but I don't
    really see where there's a problem.  Well, I just
    think, you know, you need to be here on time.  I said,
    okay.  Sounds good.
Q:  Did you acknowledge in February of 2006 that there was
    a problem with your arriving to work on time?
A:  No, I did not, and I still don't.
Q:  Okay.  Would you agree that Mr. Van Hook indicated to
    you he felt there was a problem?
A:  No.  He told me that people in the office thought it
    was a problem and he just didn't want to have to  – –
    to face that.  Just if there was a problem, take care
    of it.
Q:  Did Mr. Van Hook indicate who was complaining to him
    that it was a problem?
A:  No.  But when you have a three person office and it's
    not you . . .
Q:  The other three people would be Rhonda Littrell – –
A:  No.  Rhonda and – – Toni, but Mary Lynn didn't come in
    until after her daughter went to school, so I don't
    think she came in until nine.
Q:  Okay.  So you surmised that the people who must be
    complaining must be Rhonda Littrell and Toni Burgess?
A:  Uh-huh.
Q:  Is that a yes?
A:  That would be a yes.
Q:  Okay.  Because they would be the only two people who
    would be in the office at the time in the morning to
    see whether you were present or not; is that correct?
A:  That would seem to be correct, yes.
Q:  Okay.  Did they ever indicate to you that they were
    having problems in their work because of your
    punctuality or lack thereof?
A:  No.

23

> Q:   Did they ever indicate they were having problems in
>      their work because of your lack of attendance at work?
> A:   No.

(Porter Depo., 258:8-260:18).  Plaintiff also cites page 257,

line 24 throngh page 258, line 5 of her deposition:

> Q:   Okay.  In the last year of employment, what percentage
>      of the time would you estimate you arrived to work by 8
>      a.m.?
> A:   Well, apparently you and I don't agree.  So I'm going
>      to say 98 percent of the time, but . . .
> Q:   Okay.  You don't recall problems being created because
>      you were coming to work much later than 8 a.m.?
> A:   No, sir, I don't.

The evidence cited by plaintiff does not controvert the fact that

Ms. Littrell was tired of plaintiff not being in the office.  If

fact, page 259, line 11 through page 260, line 10 demonstrate

plaintiff thought Ms. Littrell complained to defendant Van Hook

about her.  I find this fact to be uncontroverted.

**63. Rhonda Littrell did not speak to Jane Porter about her**

**absenteeism because "[Rhonda] couldn't approach Jane about that**

**because at that point [Jane] had become a very hostile and angry**

**person and there was no approaching her."**

In support of this fact, defendants cite page 65, lines 19-

25 of Ms. Littrell's deposition:

> A:   Toward her at the time, I didn't have any ill feelings
>      towards Jane.  I was just tired of her not being in the
>      office to do her job.
> Q:   Yet you didn't talk to Jane about that?
> A:   I couldn't approach Jane about that because at that
>      point she had become a very hostile and angry person
>      and there was no approaching her.

24

To controvert this fact, plaintiff cites testimony from her deposition wherein she stated she became aware that Ms. Littrell complained to defendant Van Hook about her alleged absenteeism. This evidence does not address why Ms. Littrell did not speak to plaintiff about her absenteeism. I find this fact to be uncontroverted.

**64. Rhonda Littrell** and Toni Burgess **reported to Mayor Van Hook that Jane Porter was frequently absent and that she was not doing her job.**

Plaintiff controverts this proposed fact in part. She states that the record does not contain an indication as to the exact nature of Ms. Burgess' reports as Ms. Burgess was not deposed.

In support of this fact, defendants cite page 78, line 13 through page 79, line 4 of Ms. Littrell's deposition:

> Q:  So if I understand the time line generally, you and Toni decided to go talk to Art Van Hook in late 2005 or early 2006?
> A:  Uh-huh.
> Q:  And what did you tell Art Van Hook at that time?
> A:  Basically that Jane Porter was not doing her job and she was gone three fourths of the time.
> Q:  You used those terms, gone three-fourths of the time?
> A:  Maybe not in those terms.
> Q:  She was gone a lot and it's putting pressure on you and Toni?
> A:  Uh-huh.  People are getting mad because she is getting mad at Toni and I because she is missing meetings that she set up with them.

25

I agree with plaintiff; the cited testimony references what Ms. Littrell reported to defendant Van Hook. I find the emboldened language of this proposed fact to be uncontroverted.

65. Toni Burgess also reported to Mayor Van Hook that there were "some issues with the payroll and the credit cards ... ."

Plaintiff controverts this proposed fact in part. She states that the record does not contain an indication as to the exact nature of Ms. Burgess's reports as Ms. Burgess was not deposed.

In support of this fact, defendants cite page 79, lines 5-11 of Ms. Littrell's deposition:

> Q: Anything else you told Art?
> A: I think that was all I told Art. Toni Burgess brought up those same things and that she also brought up some issues with the payroll and the credit cards and I think there may have been something else she brought up, but I can't recall what it was.

Hearsay is a "statement, other than one made by the declarant, . . . offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Here, defendants are offering Ms. Littrell's deposition testimony to prove the truth of Mr. Burgess's report to defendant Van Hook. Because hearsay is given no effect in considering motions for summary judgment, see Fireman's Fund Ins. Co. v. Thien, 8 F.3d 1307, 1310 (8th Cir. 1993), this proposed fact is controverted.

Case 4:07-cv-00461-REL   Document 131   Filed 03/31/09   Page 26 of 137

66. **These reports were made to Mayor Van Hook because the "city business was not being taken care of and it was not fair to the citizens of Lake Lotawana."**

Plaintiff controverts this proposed fact in part. She states that the record does not contain an indication as to the exact nature of Ms. Burgess's reports as Ms. Burgess was not deposed and defendants did not offer an affidavit from Ms. Burgess.

In support of this fact, defendants cite page 79, line 17 through page 80, line 6, of Ms. Littrell's deposition:

> Q:   How did you couch it to Mr. Van Hook, the mayor? Did you say we are concerned about Jane or we are concerned about ourselves?
> A:   I don't think I really said I was concerned about anybody. I was concerned about the City of Lake Lotawana.
> Q:   You went to the mayor because you were concerned that the city business wasn't being done?
> A:   The city business was not being taken care of and it was not fair to the citizens of Lake Lotawana.
> Q:   You felt that way and that's why you went to the mayor?
> A:   Uh-huh.

I find this fact to be uncontroverted to the extent it addresses why Ms. Littrell approached defendant Van Hook about plaintiff.

67. Toni Burgess reported to Mayor Van Hook that there were "some purchases made on the credit cards that were not city purchases."

27

In support of this fact, defendants cite page 84, line 19 through page 85, line 3 of Ms. Littrell's deposition:

Q: The issues that Toni raised, what was the issue with payroll that you recall?
A: I don't recall, because I was not involved in that one.
Q: You were in the meeting?
A: I was in the meeting, yes.
Q: What was the issue with the credit cards?
A: There were some - - there was some purchases made on the credit cards that were not city purchases.

Plaintiff controverts this proposed fact. She states she accidentally used a City of Lake Lotawana credit card for personal purchases on three occasions, but reimbursed the City for the full amount. Plaintiff further contends the exact nature of Ms. Burgess's reports are unknown since she was not deposed and defendants did not offer her affidavit.

Hearsay is a "statement, other than one made by the declarant, . . . offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Here, defendants are offering Ms. Littrell's deposition testimony to prove the truth of Mr. Burgess's report to defendant Van Hook. Because hearsay is given no effect in considering motions for summary judgment, see Fireman's Fund Ins. Co. v. Thien, 8 F.3d 1307, 1310 (8th Cir. 1993), this proposed fact is controverted.

**68. Rhonda Littrell specifically recalled seeing a City credit card bill where Jane Porter "made personal purchases on**

28

**the city's credit cards [for] rubber ducks she gave [Rhonda's]
grandson for Christmas."**

In support of this fact, defendants cite page 85, line 4
through page 86, line 11 of Ms. Littrell's deposition:

> Q: And do you recall any specifics concerning that?
> A: The only things I specifically know of was there was
> some Christmas gifts that I know that was put on the
> credit card, but from there I do not know any other
> specifics.
> Q: How do you know that they were Christmas gifts?
> A: Because one of the items that was listed on the bill
> that I saw was she made personal purchases on the
> city's credit cards was some rubber ducks she gave my
> grandson for Christmas.
> Q: Rubber ducks?
> A: Uh-huh.
> Q: What kind of rubber ducks, like the kind you play in
> the tub?
> A: Play in the bathtub with.
> Q: You saw on a credit card statement for the City of Lake
> Lotawana some rubber ducks?
> A: Yes.
> Q: Then Jane Porter gave your grandson some rubber ducks
> for Christmas?
> A: Yes.
> Q: What leads you to believe they are the same rubber
> ducks?
> A: They were the brand that was on the tag that was given
> to him.  I don't know.  I mean - -
> Q: Are you saying that you recall the brand?
> A: Not really, but I mean, she gave him rubber ducks, it
> was on the credit card bill.  Why would the city buy
> rubber ducks?  The city has no need for rubber ducks.

Plaintiff disputes this fact, citing additional testimony
from Ms. Littrell's deposition wherein she stated she
specifically recalled plaintiff paying the City of Lake Lotawana
back for the accidental purchase of the rubber ducks (Littrell
Depo, 88:21-89:3).  She also cites testimony from her own

29

deposition wherein she acknowledged she accidentally used the City's credit card to make personal purchases (Porter Depo., 279:6-280:20). Whether or not the purchase was accidental does not change the fact that Ms. Littrell recalled seeing plaintiff's personal purchases on the City's credit card bill. I find this fact to be uncontroverted.

**69.  At the conclusion of the meeting between Rhonda Littrell, Toni Burgess and Mayor Van Hook, it was stated that Mayor Van Hook would speak to Jane Porter about these issues.**

Plaintiff does not dispute this fact.

**70.  Mayor Van Hook** and the Lake Lotawana Board of Aldermen **were the supervisors of Jane Porter.**

In support of this fact, defendants cite excerpts from Ms. Littrell and plaintiff's respective depositions:

Q:    Did you believe that the mayor was Jane's supervisor?
A:    Yes.  The mayor and the Board of Aldermen.

(Littrell Depo., 92:15-17).

Q:    Okay.  Who was your supervisor as a city clerk?
A:    The mayor.
Q:    And that would be either Mayor Nixon or Mayor Van Hook?
A:    Or Mayor Beer.
Q:    Okay.
A:    Nixon, Beer, Van Hook.

(Porter Depo. 153:22-154:3).  I find the portion of this fact typeset in bold to be uncontroverted.  Because plaintiff only testified during her deposition that the mayor was her supervisor, this seeming inconsistency regarding the portion

30

stating the Board of Aldermen also supervised plaintiff remains controverted.

**71.  On February 1, 2006, Mayor Van Hook called Jane Porter into a meeting to discuss her attendance at work.**

Plaintiff objects to this fact stating she was "not repeatedly late to work as the statement indicates, and her testimony is misrepresented in this statement of fact."  I disagree; plaintiff testified at page 258, line 13 through page 259, line 4 that defendant Van Hook met with her on February 1, 2006, to discuss arriving late to work.

**72.  Mayor Van Hook told Jane Porter that the people in the office believed there was a problem and that she should correct the problem.**

In support of this fact, defendants cite an excerpt from plaintiff's deposition:

    Q:   Okay.  Would you agree that Mr. Van Hook indicated to
         you he felt there was a problem?
    A:   No.  He told me that people in the office thought it
         was a problem and he just didn't want to have to - - to
         face that.  Just if there was a problem, take care of
         it.

(Porter Dep., 259:9-14).

Plaintiff disputes this fact, stating defendant Van Hook felt plaintiff was "overworked" and that if he eliminated a non-essential job function it would alleviate the burden on plaintiff

and save the city money (Van Hook Depo., 39:19-40:22). This evidence does not controvert defendants' proposed fact.

**73. Mayor Van Hook did not tell Jane Porter who had complained about her performance.**

Plaintiff does not dispute this fact.

74. There were only three people who worked in the office at the City of Lake Lotawana.

In support of this proposed fact, defendants cite plaintiff's deposition testimony:

```
Q:   Did Mr. Van Hook indicate who was complaining to him
     that it was a problem?
A:   No.  But when you have a three person office and it's
     not you . . .
Q:   The other three people would be Rhonda Littrell --
A:   No.  Rhonda and  - - and Toni, but Mary Lynn didn't
     come in until after her daughter went to school, so I
     don't think she came in until nine.
```

(Porter Depo., 259:15-24). This testimony establishes at least four people worked in the office at the City of Lake Lotawana. This fact remains controverted.

**75. Jane Porter surmised that the people who were complaining must be Rhonda Littrell and Toni Burgess.**

Plaintiff does not dispute this fact.

**76. Mayor Van Hook then held another meeting that was attended by Mayor Van Hook, Jane Porter, Rhonda Littrell and Toni Burgess.**

Plaintiff does not dispute this fact.

32

**77. At this meeting Mayor Van Hook told Jane Porter, Rhonda Littrell and Toni Burgess that they all needed to get along and work out any issues.**

Plaintiff does not dispute this fact.

78. At this meeting Jane Porter knew that Rhonda Littrell and Toni Burgess were the ones who had brought up issues to Mayor Van Hook regarding Jane Porter's job performance.

In support of this position, defendants cite Ms. Littrell's deposition testimony:

Q:    At that meeting Jane knew that you and Toni were the
      ones that brought up these issues concerning her job
      performance?
A:    Yes.

(Littrell Depo., 95:16-19).

Plaintiff controverts this fact, maintaining Ms. Littrell was speculating. I agree. The cited evidence does not state how Ms. Littrell was aware of what plaintiff did or did not know. Therefore, I find this proposed fact remains controverted.

**79. Jane Porter began to retaliate against Rhonda Littrell and Toni Burgess after this meeting.**

In support of this proposed fact, defendants cite page 95, lines 20-22 of Ms. Littrell's deposition:

Q:    So after this meeting with the three of you, you
      believe she became retaliatory?
A:    Yeah.

33

Plaintiff disputes this fact on grounds that it calls for a legal conclusion and is based on one employee's perception. Plaintiff then states that the record is devoid of any mention of retaliation on behalf of Jane Porter. Importantly, this lack of information does not controvert Ms. Littrell's testimony. A dispute of fact is considered genuine only if the non-moving party has produced sufficient evidence such that a reasonable jury could return a verdict for that party. <u>Anderson</u>, 477 U.S. at 249. Merely denying a proposed fact without pointing to any evidence in the record does not result in a proposed fact being considered disputed for summary judgment. I find this proposed fact to be uncontroverted.

**80. Jane Porter's hostility and anger got worse toward everybody in the office.**

In support of this proposed fact, defendants cite page 95, line 23 through page 96, line 2 of Ms. Littrell's deposition:

    Q:  How do you believe that she became retaliatory? Did
        she specifically retaliate against you in some way?
    A:  The hostility and the anger just got worse towards
        everybody in the office.

Plaintiff disputes this fact on grounds that it calls for a legal conclusion and is based on one employee's perception. Plaintiff then states that the record is devoid of any mention of retaliation on behalf of Jane Porter. Importantly, this lack of information does not controvert Ms. Littrell's testimony. A

34

dispute of fact is considered genuine only if the non-moving party has produced sufficient evidence such that a reasonable jury could return a verdict for that party. <u>Anderson</u>, 477 U.S. at 249. Merely denying a proposed fact without pointing to any evidence in the record does not result in a proposed fact being considered disputed for summary judgment. I find this proposed fact to be uncontroverted.

**81. Jane Porter's yelling and screaming in the office got worse and became a constant every day issue.**

In support of this proposed fact, defendants cite page 96, lines 18-24 of Ms. Littrell's deposition:

> Q: That's fair enough. So tell me how the hostility grew worse towards you.
> A: Grew worse?
> Q: Yes.
> A: The yelling, and I'd call it yelling and screaming in the office got worse and just a constant every day issue.

Plaintiff disputes this fact on grounds that it calls for a legal conclusion and is based on one employee's perception. Plaintiff then states that the record is devoid of any mention of retaliation on behalf of Jane Porter. Importantly, this lack of information does not controvert Ms. Littrell's testimony. A dispute of fact is considered genuine only if the non-moving party has produced sufficient evidence such that a reasonable jury could return a verdict for that party. <u>Anderson</u>, 477 U.S. at 249. Merely denying a proposed fact without pointing to any

35

evidence in the record does not result in a proposed fact being considered disputed for summary judgment.  I find this proposed fact to be uncontroverted.

**82.  On May 3, 2006, Toni Burgess sent an email to Mayor Van Hook and reported, "The last month in this office has been hell. Jane has almost been impossible [sic] to work with. She is short in her responses and is very aggressive when it comes to Rhonda. It has definatly [sic] put a strain on the office as a whole. It has gotten to the point that this is effecting [sic] me in my outside life away from the office. My blood pressure is 140 over 100, my stress level is through the roof and I cannot sleep. I hate coming to work because of the atmosphere. I understand that there are reprocusions [sic] to actions, but the city won't last long if this behavior and actions continue."**

Plaintiff controverts this fact, stating she was unaware of the allegations and such information was not referenced when she was placed on leave and/or terminated.  Importantly, this lack of information does not controvert Ms. Burgess's e-mail to defendant Van Hook.  A dispute of fact is considered genuine only if the non-moving party has produced sufficient evidence such that a reasonable jury could return a verdict for that party.  <u>Anderson</u>, 477 U.S. at 249.  Merely denying a proposed fact without pointing to any evidence in the record does not result in a proposed fact

36

being considered disputed for summary judgment.  I find this
proposed fact to be uncontroverted.

**83.  On May 3, 2006, Toni Burgess went on to report, "Rhonda
does everything up here. Without her orginization [sic] skills,
accounting skills and persistance [sic] to follow through with
the work she is doing, this office would not be able to operate
at all. It hurt me as a person and an employee to see someone who
is here everyday [sic] and doing the work that is required and on
time to be treated with such disrespect as I have seen Jane treat
Rhonda. Snappy responses, short grunts and talking under her
breath is what we have had to endor [sic] and it is mostly
directed to Rhonda but includes all of us."**

Plaintiff controverts this fact, stating she was unaware of
the allegations and such information was not referenced when she
was placed on leave and/or terminated.  Importantly, this lack of
information does not controvert Ms. Burgess's e-mail to defendant
Van Hook.  A dispute of fact is considered genuine only if the
non-moving party has produced sufficient evidence such that a
reasonable jury could return a verdict for that party.  <u>Anderson</u>,
477 U.S. at 249.  Merely denying a proposed fact without pointing
to any evidence in the record does not result in a proposed fact
being considered disputed for summary judgment.  I find this
proposed fact to be uncontroverted.

37

84. While Jane Porter was employed by the City of Lake Lotawana she had two credit cards in her possession that were issued to the City of Lake Lotawana.

Plaintiff does not dispute this fact.

85. Jane Porter had possession of one of three Visa cards that were issued to the City of Lake Lotawana.

Plaintiff does not dispute this fact.

86. Jane Porter's City Visa card was differentiated from the other two by the word "administrative."

Plaintiff does not dispute this fact.

87. Jane Porter also had possession of one of three Wal-Mart credit cards that were issued to the City of Lake Lotawana.

Plaintiff does not dispute this fact.

88. Jane Porter's City Wal-Mart card was differentiated from the others by denoting it as "No. 1 ... ."

Plaintiff does not dispute this fact.

89. Jane Porter used the City of Lake Lotawana's credit cards to make purchases at Hy-Vee, Clinton Flowers, Gevalia Shipment, Mr. Goodcents Subs & Pastas, Applebee's, Tom's Meat Market, Golden Egg Roll, Things Remembered, Shawhan HSE Tea Room, Jason's Deli, Atlanta Bread Company, Hen House, Pizza Hut, Big Lots, Wal-Mart, Price Chopper, Greenwood Country Team Room, Rheinland, Courthouse Restaurant, and Casey's General Store.

38

Plaintiff does not dispute this fact.

**90.  In February 2006 Mayor Van Hook was signing checks and he looked at Jane Porter's Visa bill, inquired about the purchases she was making, and directed her not to make any more food purchases.**

Plaintiff does not dispute this fact.

**91.  In March 2006 Mayor Van Hook was signing checks and he looked at Jane Porter's Wal-Mart bill and he wrote her a note inquiring "what is this for" about a specific charge.**

Plaintiff controverts this proposed fact, stating she merely forgot to pay the incidental personal purchase and requested it be paid from her personal account.  This does not controvert the fact that defendant Van Hook wrote her a note about the specific charge.  In fact, plaintiff testified at her deposition about the note (Porter Depo. 280:14-20, 283:5-23).  This fact is uncontroverted.

**92.  After reviewing Mayor Van Hook's note and the charge that he was inquiring about, then Jane Porter acknowledged she had made a personal purchase with the city's credit card.**

Plaintiff controverts this proposed fact, stating that defendant Van Hook has no recollection of whether plaintiff reimbursed the City of Lake Lotawana.  Whether or not the city was reimbursed for the purchase does not controvert that

39

plaintiff acknowledged the personal purchase.  This fact is
uncontroverted.

**93.  On April 6, 2006, a meeting took place with Jane
Porter, Mayor Van Hook, Alderman/Mayor Pro Tem Rob Reid, and City
Attorney Jim Cook.**

Plaintiff does not dispute this fact.

**94.  On April 7, 2006, Mayor Van Hook provided a Memorandum
to Jane Porter that read, "As a result of our April 6 meeting
with Mr. Cook and Mr. Reid, please comply with the following
directives: 1) Immediately surrender the City credit card ... .
4) Contact Wal-Mart and obtain complete records of all credit
transactions."**

Plaintiff does not dispute this fact.

**95.  Art Van Hook asked Jane Porter to** immediately **surrender
the city credit cards because of inappropriate charges by Porter.**

Plaintiff disputes this fact.  My own review of the
deposition testimony cited by the parties reveals different time
lines for the surrender of the credit cards.  While the excerpt
cited from defendant Van Hook's deposition says
"immediately,"(Van Hook Depo., 145:17-20), the excerpt cited from
plaintiff's deposition reveals a more gradual process (Porter
Depo., 280:8-282:17).  Only the portion typeset in bold is
uncontroverted.

40

96. On April 12, 2006, Jane Porter prepared a note to file where she wrote that on April 7, 2006, she was "grilled" about "purchases of items from Wal-Mart with City card ... ."

Plaintiff does not dispute this fact.

97. On April 20, 2006 (after Toni Burgess had reported improper purchases with the city credit cards, and after Rhonda Littrell had seen personal purchases made by Jane Porter on city credit cards, and after Mayor Van Hook directed Porter not to make any additional food purchases, and after Mayor Van Hook had questioned Porter about a specific personal purchase, and after Jane Porter was directed to surrender the city credit card, and after Porter was directed to obtain complete records of all Wal-Mart credit transactions, and after Porter was "grilled" about purchases of items from Wal-Mart), Porter prepared a Memorandum and wrote, "While doing an internal audit, I discovered I had by accident made charges for myself on the City's card. It was a mistake, and one which I am truly sorry for. Therefore, I am depositing $239.09 in the General Fund Account to cover these charges which I mistakenly made."

Plaintiff disputes this fact, stating she decided to perform an internal audit on her own accord and reimbursed the City of Lake Lotawana on her own accord. Defendants' proposed fact does

41

not state at whose request the audit was performed.  I find this fact to be uncontroverted.

98.  **Jane Porter's April 20, 2006, check for $239.09 was intended to pay back the City of Lake Lotawana for three separate charges she had made for personal items on the city's Wal-Mart credit card.**

Plaintiff does not dispute this fact.

99.  **The three charges on the city's Wal-Mart card that Jane Porter admits making are on June 5, 2005, for $97.06; September 5, 2005, for $46.39; and December 21, 2005, for $95.64.**

Plaintiff does not dispute this fact.

100. **A purchase was made on September 16, 2005, with Jane Porter's city Wal-Mart card that Jane Porter agrees was not a legitimate city purchase, although Porter denies making that purchase.**

Plaintiff disputes this fact, stating she is "certain" that she did not make the September 16, 2005, purchase.  Because defendants' proposed fact also states plaintiff denied making the purchase I find this fact to be uncontroverted.

101. **A purchase was made on July 25, 2005, with Jane Porter's city Wal-Mart card that Porter agrees contains items that are not legitimate city purchases, and Porter has never reimbursed the city for those items.**

42

Plaintiff disputes this fact, citing page 300, lines 1-7 of her deposition:

> Q:  Okay.  And someone who used your card on July 25, 2005, inappropriately used city funds; correct?
> A:  Correct.
> Q:  And you're not aware of those funds being repaid to the city to this day; correct?
> A:  No, sir, I'm not.

This testimony does not controvert defendants' propose fact, but rather supports it.  I find this fact to be uncontroverted.

**102. Kent Deselle is an attorney who has represented Jane Porter's husband.**

Plaintiff does not dispute this fact.

**103. With regard to Kent Deselle's overdue sewer bill, Jane Porter wrote a note saying, "Leave Mr. Deselle alone -- I will deal w/him."**

Plaintiff does not dispute this fact.

104. Mayor Van Hook believes Jane Porter abused her discretion in writing off a $5,000 sewer bill for Kent Deselle.

Plaintiff disputes this fact, citing excerpts from her and defendant Van Hook's respective depositions.  Plaintiff testified that the amount of the bill was $1,000 or a little more (Porter Depo., 261:25-262:6).  Defendant Van Hook testified it was possible he approved the removal of Mr. Deselle's charges (Van Hook Depo., 221:4-11).  This fact remains controverted.

**105. On May 25, 2006, Jane Porter was placed on paid leave.**

43

Plaintiff does not dispute this fact.

**106. On May 25, 2006, Jane Porter was informed the City of Lake Lotawana was retaining an outside agent to investigate payroll/time card discrepancies, unauthorized paid vacation, unauthorized compensatory time, questionable credit card transactions, unauthorized sewer billing adjustments and failure to properly maintain city records in an orderly fashion.**

Plaintiff does not dispute this fact.

**107. Jane Porter was paid her salary while on administrative leave; however, based upon the advice of counsel, she was not paid for extra duties she had previously been compensated for while on administrative leave as she was not actually performing those duties.**

Plaintiff disputes this fact, citing her own deposition testimony that her extra duties were terminated on April 7, 2006 (Porter Depo., 166:16-169:3). Plaintiff's testimony states she was paid for extra duties through April because the check had already been cut at the time the decision was made to place her on administrative leave; however, plaintiff was not paid for May, June or July (Porter Depo., 166: 16-25). This fact is uncontroverted.

**108. Mayor Van Hook sent a note to Jane Porter asking her a number of questions while she was on administrative leave.**

Plaintiff does not dispute this fact.

109. Jane Porter refused to respond to the written questions submitted to her by Mayor Van Hook.

Plaintiff disputes this fact. To controvert defendants' proposed fact, plaintiff cites defendant Van Hook's deposition in which he stated plaintiff agreed to answer the question with her attorney present (Van Hook Depo., 204:1-4). Plaintiff also cites the letter she wrote to the City of Lake Lotawana's attorney informing him she would answer the questions with her attorney's presence and input (Exh. EE). This evidence controverts the fact that plaintiff refused to respond.

110. **Mayor Van Hook needed the responses to the questions so he could pay the City of Lake Lotawana's employees.**

Plaintiff disputes this fact, stating she never supplied the responses and the city employees were paid. However, plaintiff does not offer any evidence in support. Merely denying a proposed fact without pointing to any evidence in the record does not result in a proposed fact being considered disputed for summary judgment. Evidence that defendant Van Hook acknowledged he "was unqualified for the job" as Mayor does not controvert this fact.

111. **It turned out that Jane Porter had been using money in the sewer fund to pay general fund obligations.**

Plaintiff disputes this fact.  To controvert defendants'
proposed fact plaintiff cites testimony from defendant Van Hook's
deposition that Ms. Littrell printed the checks for plaintiff,
defendant Van Hook, and the City Treasurer to sign (Van Hook
Depo., 123:-15-22).  However, that same testimony also states
plaintiff assigned the account numbers.  I find this fact to be
uncontroverted.

112. The City of Lake Lotawana could not make payroll and
had to discharge other employees because of Jane Porter's failure
to respond to the questions.

Plaintiff disputes this fact, stating that the reason the
city could not make payroll was because there was not any money
in the general operating fund (Van Hook Depo., 207:4-8).  I find
this fact remains controverted.

**113. Mayor Van Hook believed Jane Porter was being
insubordinate by not responding to his written questions.**

Plaintiff does not dispute defendant Van Hook's belief.

**114. The City of Lake Lotawana has a set of local ordinances
that set out the mayor's responsibilities.**

Plaintiff does not dispute this fact.

**115. An accounting firm named Meara King was retained to
perform an investigation.**

Plaintiff does not dispute this fact.

**116. Meara King gave a verbal report of its investigation.**

46

Plaintiff does not dispute this fact.

**117. Meara King did not prepare a written report because Lake Lotawana was running low on funds.**

Plaintiff does not dispute this fact.

118. The first thing that Meara King reported to Mayor Van Hook was that Jane Porter had misappropriated $21,000.

Plaintiff disputes this fact, citing testimony from Daniel Harter's deposition in which he stated the accountants from Meara King told them that there were a lot of red flags but no real monetary findings (Harter Depo., 18:24-19:17). I find this fact remains controverted.

**119. Meara King also reported that its investigation was taking a long time because of the poor state of the records at Lake Lotawana City Hall.**

Plaintiff disputes this fact, citing defendant Van Hook's deposition testimony that Ms. Littrell "did the books" and "was essentially the financial officer" for the City of Lake Lotawana (Van Hook Depo., 42:7-17). This does not controvert defendant's proposed fact.

**120. Meara King gave a report of its investigation to the Board of Aldermen on July 28, 2006.**

Plaintiff does not dispute this fact.

121. Meara King raised a number of issues when it gave its report including problems with time cards, vacation time, checks

47

out of the general fund, not paying income tax and discrepancies on the sewer billing.

Plaintiff disputes this fact. She cites, <u>inter alia</u>, Lenda Harter's deposition in which she testified the Meara King representative said he found "three red flags basically and that was it." Defendants' proposed fact contemplates at least five problem areas. As a result, I find this fact remains controverted.

**122. Meara King reported that Jane Porter's misuse of city credit cards was an obvious red flag.**

Plaintiff disputes this fact. She cites minutes from a City of Lake Lotawana meeting at which Mr. Kostar stated Meara King did not find anything except a concern regarding the number of bank accounts (Exh. PP, at p.2). The September 18, 2007, minutes from the City of Lake Lotawana's Board of Aldermen meeting is found as Exhibit PP. Page two of the September 18, 2007, minutes state:

> Mr. Kostar stated that [Meara King] did a forensic audit. Alderman L. Harter stated it took four (4) months and there was no existing report. The City did not get anything out of the investigation so nothing should be paid. She asked Mr. Kostar what was found and he said "nothing; only a concern as to the amount of bank accounts there seemed to be.

This evidence is hearsay within hearsay. The minutes themselves are admissible under the public records exception to the hearsay rule. <u>See</u> Fed. R. Evid. 803(8). However, Mr.

48

Kostar's statement found within the minutes remains hearsay.  I find this fact to be uncontroverted.

**123.  The Meara King investigator reported to the Board of Aldermen that "there were a lot of red flags ... ."**

Plaintiff disputes this fact.  She cites minutes from a City of Lake Lotawana meeting at which Mr. Kostar stated Meara King did not find anything except a concern regarding the number of bank accounts (Exh. PP, at p.2).  The September 18, 2007, minutes from the City of Lake Lotawana's Board of Aldermen meeting are found as Exhibit PP.  Page two of the September 18, 2007, minutes states:

> Mr. Kostar stated that [Meara King] did a forensic audit. Alderman L. Harter stated it took four (4) months and there was no existing report.  The City did not get anything out of the investigation so nothing should be paid.  She asked Mr. Kostar what was found and he said "nothing; only a concern as to the amount of bank accounts there seemed to be."

This evidence is hearsay within hearsay.  The minutes themselves are admissible under the public records exception to the hearsay rule.  See Fed. R. Evid. 803(8).  However, Mr. Kostar's statement found within the minutes remains hearsay.  I find this fact to be uncontroverted.

**124.  The Board of Aldermen was also presented with evidence that Jane Porter had used city credit cards to purchase "liquor and jewelry and food and this type of thing and she had bought a blouse with that card ... ."**

49

Plaintiff disputes this fact, citing her own deposition testimony that she was "certain" she did not purchase some of the items presented to the Board of Aldermen by Meara King. Plaintiff's belief that she did not purchase the items does not controvert the fact that the Board of Aldermen was presented with evidence of the purchases. I find this fact to be uncontroverted.

**125. There was an attempt by the Lake Lotawana Board of Aldermen to vote on whether to discharge Jane Porter on July 28, 2006.**

Plaintiff does not dispute this fact.

**126. Alderman Jim Kennard tried to abstain from the July 28, 2006, vote and it was determined a second vote was necessary.**

Plaintiff does not dispute this fact.

**127. The Lake Lotawana Board of Aldermen met in closed session to discuss personnel matters on July 31, 2006, and voted to discharge Jane Porter.**

Plaintiff does not dispute this fact.

**128. Aldermen Reid, Myers, and Pfefferkorn voted to discharge Jane Porter. Aldermen D. J. Harter, Lenda Harter, and Kennard voted not to discharge Porter. Mayor Van Hook broke the tie and voted to discharge Porter.**

Plaintiff does not dispute this fact.

50

129. The Lake Lotawana Mayor is a member of the Board of Aldermen.

Plaintiff disputes this fact, citing the Government Code. Specifically, she cites to § 110.090, which states that the Mayor may sit on the Board of Aldermen but shall not vote except in a tie, and § 115.040, which differentiates the mayor as an elected official from a member elected to the Board of Aldermen. This proposed fact remains controverted.

**130. The Lake Lotawana Mayor is the Presiding Officer of the Board of Aldermen.**

Plaintiff does not dispute this fact.

**131. The Lake Lotawana Mayor has a seat in and presides over the Board of Aldermen, but does not vote on any question except in the case of a tie.**

Plaintiff disputes this fact, but references the same section of the Government Code as defendants. Section 110.090 states, "The Mayor shall have a seat in and preside over the Board of Aldermen, but shall not vote on any question except in case of a tie, nor shall he/she preside or vote in cases when he/she is an interested party." Defendants' proposed fact is taken directly from the language of the code. Merely because the proposed fact does not reference the mayor's inability to preside or vote when he or she is an interested party does not cause this proposed fact to be controverted.

51

**132. The Lake Lotawana Mayor may, with the consent of a majority vote of all the members of the Board of Aldermen, remove from office any appointive officer of the City at will.**

Section 115.040 of the Government Code states in relevant part:

> The Mayor may, with the consent of a majority of all the members elected to the Board of Aldermen, remove from office any appointive officer of the City at will, and any such appointive officer may be so removed by a two-thirds (2/3) vote of all the members elected to the Board of Aldermen, independently of the Mayor's approval or recommendation.

Plaintiff disputes this fact, stating that the mayor is not elected to the Board of Alderman and, therefore, lacks standing to vote on the removal of officers. Defendants' proposed fact does not state that the mayor must vote to remove an appointed officer. Plaintiff also states an appointed officer cannot be removed at will. The express language of this section of the code provides that the mayor can remove an appointive officer at will as long as he or she has the consent of a majority of all elected Board of Aldermen members. This proposed fact is uncontroverted.

**133. Rob Reid's vote to discharge Jane Porter was based on the credit card records that he personally reviewed, his sincere belief that Porter had purchased personal items with the city credit card, and the findings that Meara King reported.**

Plaintiff does not dispute this fact.

52

**134. Tom Myers voted to discharge Jane Porter after receiving a report from Meara King and coming to the belief that Porter had engaged in inappropriate activities.**

Plaintiff disputes this fact, citing page 30, line 1 through page 31, line 4 of Mr. Myers's deposition testimony. The cited testimony states Mr. Myers reviewed a report from the forensic accountants prior to voting to terminate plaintiff; he voted to terminate her based on the validity of the accusations (Myers Depo., 30:22-31:4). This fact is uncontroverted.

**135. Mark Pfefferkorn voted to discharge Jane Porter based upon the presentation by Meara King.**

Plaintiff disputes this fact, stating that Mr. Pfefferkorn's vote to terminate plaintiff was based on his belief that plaintiff used city credit cards to purchase personal items. A review of the cited deposition testimony reveals these reasons are one in the same. Meara King gave a presentation to the Board of Aldermen in July of 2006 regarding plaintiff's use of the city's credit card for personal reasons; it was for this reason Mr. Pfefferkorn voted to terminate plaintiff (Pfefferkorn Depo., 23:6-8, 24:22-24, 25:2-14, 26:19-22). This fact is uncontroverted.

**136. Mark Pfefferkorn testified, "I think the fact that she used a corporate credit card for personal use is enough to get fired in any business. It would be in mine."**

Plaintiff does not dispute this fact.

137. **D. J. Harter voted not to discharge Jane Porter because he could not come up with any reason to discharge her.**

Plaintiff does not dispute this fact.

138. **D. J. and Lenda Harter were personal friends with Jane Porter and Mr. Porter, both prior to and after Jane Porter's discharge.**

Plaintiff does not dispute this fact.

139. **For example, Mr. and Mrs. Harter shared breakfast with Mr. and Mrs. Porter the day before Mr. and Mrs. Harter's depositions.**

Plaintiff does not dispute this fact.

140. **D. J. Harter believes Art Van Hook wanted to fire Jane Porter to make her a scapegoat for Lake Lotawana's financial problems.**

Plaintiff does not dispute this fact.

141. **Lenda Harter voted not to discharge Jane Porter.**

Plaintiff does not dispute this fact.

142. **Lenda Harter did her own investigation of spending by Jane Porter, Police Chief Poletis, and Public Works Director Pendergist.**

Plaintiff does not dispute this fact.

54

**143. Lenda Harter did not find any wrongdoing by Public Works Director Pendergist.**

Plaintiff does not dispute this fact.

**144. Lenda Harter did find wrongdoing by Jane Porter.**

Plaintiff disputes this fact.  To controvert this fact, plaintiff cites Ms. Harter's deposition testimony in which she stated she found alleged wrongdoing by plaintiff and talked to her about the alleged wrongdoing.

> Q:   Did you find any alleged wrongdoing on behalf of Jane Porter?
> A:   There [were] a few items, yes.
> Q:   Did you talk to Ms. Porter about that?
> A:   I asked about that and also I talked with Linda - - I can't remember her last name - - who was working there, and Linda had been told, Jane had told her she bought some items using the credit card and when they came through on a bill, would she please let her know so she could refund the city on those, and Linda forgot about it, Jane forgot about it; after you wait a month before your bill comes and after several months, Jane realized then what had happened and she went to Linda.  I suggested that Linda write a letter to state that this is what happened and she went to and asked the mayor and the mayor wasn't too happy about it, but she wrote the letter, I believe, to the mayor.

(Harter Depo., 11:13-12:7).  Ms. Harter's subsequent discussion of plaintiff's explanation does not controvert her finding of wrongdoing.  This fact is uncontroverted.

**145. Lenda Harter also found spending irregularities by Police Chief Poletis.**

Plaintiff does not dispute this fact.

**146. Lenda Harter brought Police Chief Poletis's spending to the attention of Mayor Van Hook and the Board of Aldermen and they were not concerned by the spending of Police Chief Poletis.**

Plaintiff disputes this fact, citing Ms. Harter's deposition testimony that defendant Van Hook and the Board of Aldermen did not care about Police Chief Poletis's spending habits was because plaintiff "was the one being ousted." (Harter Depo., 12:25-14:8). This testimony merely confirms that defendant Van Hook and the Board of Aldermen were not concerned about Police Chief Poletis's spending habits. This fact is uncontroverted.

**147. Meara King's investigation also involved the credit card records of the Police Department and the Public Works Department.**

Plaintiff disputes this fact, citing defendant Van Hook's deposition testimony in response. She specifically cites page 62, lines 3-22, in which he states:

> Q:   Okay. Did you have a problem with vacation time with anyone else?
> A:   Not then.
> Q:   Okay. You did later?
> A:   Yes.
> Q:   With who?
> A:   With Ms. Porter's records.
> Q:   What problem did you notice then?
> A:   This was after the Meara King investigation, and we started looking at all the records very carefully, and she was charging time for vacation. She was accruing time for vacation that she wasn't entitled to, and then she would pay herself for the vacation in direct violation of the code.
> Q:   And when do you believe that you learned that?

56

```
A:    When I started looking at the books very carefully and
      I hired a company to do it.
Q:    You hired Meara King?
A:    Yes, I did.
```

This testimony does not controvert defendants' proposed fact.

**148. Meara King's concerns about the Police Department were not of any significance and Meara King had no concerns about the Public Works Department.**

Plaintiff disputes this fact. In support of this proposed fact, defendants cite page 11, lines 13-19 of defendant Van Hook's deposition:

```
Q:    Any concerns they raised about the police department or
      Public Works or anything else?
A:    None about Public Works, but there was some charges on
      the credit cards for food, and it turns out they were
      correlated to various meetings; but there weren't that
      many, so nothing really of any significance.
```

Plaintiff controverts this fact by citing Linda Harter's deposition in which she testified defendant Van Hook singled out plaintiff for investigation (Harter Depo., 16:5-8). This does not controvert defendants' proposed fact regarding Meara King's concerns about the Police Department and the Public Works Department.

**149. Mark Pfefferkorn believed that Police Chief Poletis's use of city credit cards was for business trips and was legitimate.**

57

Plaintiff disputes this fact. In support of this proposed fact, defendants cite page 26, line 23 through page 27, line 13 of Mr. Pfefferkorn's deposition:

> Q: I may, I don't know, I don't know all the facts, but did you ever ask why Randy Poletis or Patrick Pendergist weren't being investigated?
> A: Regarding what?
> Q: Their use of credit cards.
> A: I saw some evidence that was given in regards to the usage of Randy's credit card and none of the elements that were brought to my attention were personal. They were all tied to trips that he took on business which is a good reason for using a credit card if you are on a business trip.
> Q: One of your fellow Board of Aldermen brought that to your attention?
> A: Yes.

Plaintiff controverts this fact by citing the portion of Mr. Pfefferkorn deposition in which he testified that the use of "a corporate credit card for personal use is enough to get fired in any business." (Pfefferkorn Depo., 26:20-22). This statement was made concerning plaintiff's credit card use and does not controvert defendants' proposed fact as Mr. Pfefferkorn testified there was no evidence of Police Chief Poletis using the city credit card for personal use.

**150. Lenda Harter and Jane Porter are friends.**

Plaintiff does not dispute this fact.

**151. Lenda Harter dislikes Art Van Hook, who has been a political opponent of hers.**

Plaintiff does not dispute this fact.

Case 4:07-cv-00461-REL   Document 131   Filed 03/31/09   Page 58 of 137

**152. Lenda Harter believes Art Van Hook wanted to discharge Jane Porter to cover up something Art Van Hook had done.**

Plaintiff does not dispute this fact.

**153. Jim Kennard cannot remember whether he voted to discharge Jane Porter or not to discharge her.**

Plaintiff disputes this fact, stating Mr. Kennard's vote is properly in the Board of Aldermen's July 31, 2006, minutes. Importantly, however, defendants' proposed fact does not state whether or not Mr. Kennard voted to terminate plaintiff, but rather whether he remembers how he voted. Review of the evidence cited by defendants reveals Mr. Kennard first testified he voted to terminate plaintiff (Kennard Depo., 21:21-22:2), he later stated he voted to retain her (Kennard Depo., 23:10-15), and again testified he voted to terminate plaintiff (Kennard Depo., 30:25-31:6). The cited testimony makes clear Mr. Kennard did not remember how he voted, thus making defendants' proposed fact uncontroverted.

**154. Jane Porter prepared a letter dated July 26, 2006, to Lake Lotawana City Attorney Jim Cook where she claimed to be a victim of age discrimination and gender discrimination.**

Plaintiff does not dispute this fact.

155. Mr. Cook never notified the Board of Aldermen of the existence of Jane Porter's complaints prior to the vote on her discharge.

Plaintiff disputes this fact, stating that defendant Van Hook had knowledge of plaintiff's complaint of age and sex discrimination as of July 28, 2006, that defendant Van Hook spearheaded both votes to terminate plaintiff, and that defendant Van Hook improperly broke the ties of the vote of the Board of Aldermen. This does not controvert defendants' proposed fact. Defendants' proposed fact states that Mr. Cook never notified the Board of Aldermen about plaintiff's complaints, not whether defendant Van Hook knew of her complaints. However, plaintiff also cites an e-mail from James Cook to plaintiff in which he states he received plaintiff's letter on July 28, 2006. The e-mail goes on to state that the "letter was not even received until after the Board's actions were taken"; however, I note that the Board of Aldermen voted to terminate plaintiff on July 31, 2006. <u>See</u> Fact No. 127. This fact remains controverted.

156. Rob Reid never saw Jane Porter's July 28, 2006, letter prior to his vote to discharge Jane Porter.

Plaintiff disputes this fact. She states there is a factual dispute whether the Board had knowledge of the letter, and cites Mr. Cook's emails to controvert defendants' fact (Exh. MM, NN). Defendants' proposed fact states that Mr. Reid had not seen plaintiff's letter prior to his vote. Review of Mr. Cook's e-mail reveals that the Board of Aldermen was aware of the letter, but that the "letter was not even received until after the

60

Board's actions were taken." I note that the letter was received on July 28, 2006, and the Board's actions were taken on July 31, 2006. See Exh. NN; Fact No. 127. Accordingly, this fact remains controverted.

157. Tom Myers was not aware that Jane Porter had contacted Jim Cook about her complaints prior to his vote to discharge Jane Porter.

Plaintiff disputes this fact. She states there is a factual dispute whether the Board had knowledge of the letter, and cites Mr. Cook's emails to controvert defendants' proposed fact (Exh. MM, NN). Defendants' proposed fact states that Mr. Myers was not aware plaintiff had contacted Mr. Cook prior to his vote. Review of Mr. Cook's e-mail reveals that the Board of Aldermen was aware of the letter, but that the "letter was not even received until after the Board's actions were taken." I note that the letter was received on July 28, 2006, and the Board's actions were taken on July 31, 2006. See Exh. NN; Fact No. 127. Accordingly, this fact remains controverted.

158. Mark Pfefferkorn never heard of Jane Porter's complaints of age or gender discrimination before his vote to discharge Jane Porter.

Plaintiff disputes this fact. She states there is a factual dispute whether the Board had knowledge of the letter, and cites Mr. Cook's emails to controvert defendants' proposed fact (Exh.

MM, NN). Defendants' proposed fact states that Mr. Pfefferkorn had not heard of plaintiff's complaints prior to his vote. Review of Mr. Cook's e-mail reveals that the Board of Aldermen was aware of the letter, but that the "letter was not even received until after the Board's actions were taken." I note that the letter was received on July 28, 2006, and the Board's actions were taken on July 31, 2006. <u>See</u> Exh. NN; Fact No. 127. Accordingly, this fact remains controverted.

159. D. J. Harter never saw Jane Porter's complaints of age or gender discrimination before his vote not to discharge Porter.

Plaintiff disputes this fact. She states there is a factual dispute whether the Board had knowledge of the letter, and cites Mr. Cook's emails to controvert defendants' proposed fact (Exh. MM, NN). Defendants' proposed fact states that Mr. Harter had not seen plaintiff's complaints prior to his vote. Review of Mr. Cook's e-mail reveals that the Board of Aldermen was aware of the letter, but that the "letter was not even received until after the Board's actions were taken." I note that the letter was received on July 28, 2006, and the Board's actions were taken on July 31, 2006. See Exh. NN; Fact No. 127. Accordingly, this fact remains controverted.

160. Lenda Harter never saw Jane Porter's complaints of age or gender discrimination before her vote not to discharge Porter.

Plaintiff disputes this fact.  She states there is a factual dispute whether the Board had knowledge of the letter, and cites Mr. Cook's emails to controvert defendants' proposed fact (Exh. MM, NN).  Defendants' proposed fact states that Ms. Harter had not seen plaintiff's complaints prior to her vote.  Review of Mr. Cook's e-mail reveals that the Board of Aldermen was aware of the letter, but that the "letter was not even received until after the Board's actions were taken."  I note that the letter was received on July 28, 2006, and the Board's actions were taken on July 31, 2006.  See Exh. NN; Fact No. 127.  Accordingly, this fact remains controverted.

**161. Jim Kennard cannot remember if he first heard of Jane Porter's complaints of age and gender discrimination before or after the vote to discharge Porter.**

Plaintiff does not dispute this fact.

**162. Art Van Hook did not see Jane Porter's complaints of age and gender discrimination prior to his vote to discharge Porter.**

Plaintiff disputes this fact.  She states Mr. Cook acknowledged via e-mail that defendant Van Hook was aware of her complaints (Exh. MM, NN).  My review of Mr. Cook's e-mail reveals no reference to defendant Van Hook being aware of the letter.  This fact is uncontroverted.

63

**163. Aldermen Reid, Myers, and Pfefferkorn voted to terminate Jane Porter while Aldermen D. J. Harter, Lenda Harter and Jim Kennard voted not to terminate her.**

Plaintiff does not dispute this fact.

**164. After the initial tie vote, Mayor Van Hook broke the tie by voting in favor of termination.**

Plaintiff does not dispute this fact.

165. Mayor Van Hook's actions were not influenced by Jane Porter's age or gender.

Plaintiff objects to this proposed fact on grounds that it calls for a conclusion of law that invades the province of the jury. I agree. This fact remains controverted.

**166. Mayor Van Hook believed Jane Porter's discharge would be appropriate after Meara King's presentation.**

Plaintiff's response to this proposed fact is two-fold. Plaintiff first objects that this fact is actually a conclusion of law that invades the province of the jury. She next states the proposed fact is uncontroverted as to defendant Van Hook's belief. Because the language of defendants' proposed fact states, "Mayor Van Hook <u>believed</u> . . .." I find it to be uncontroverted.

**167. Police Chief Poletis was born on April 10, 1947. He is presently 61 years of age.**

Plaintiff does not dispute this fact.

64

**168. Jane Porter believes Police Chief Poletis held a position similar to her.**

Plaintiff does not dispute this fact.

**169. Police Chief Poletis was in charge of the Police Department.**

Plaintiff does not dispute this fact.

**170. Jane Porter and Police Chief Poletis do vastly different jobs.**

Plaintiff disputes this fact, citing testimony from defendant Van Hook's deposition that plaintiff, Randy Poletis, and Patrick Pendergist were three department heads (Van Hook Depo., 144:18-25). The fact that plaintiff and Police Chief Poletis were both department heads does not controvert that their respective jobs were different. This fact is uncontroverted.

**171. Jane Porter has not gone through the Police Academy.**

Plaintiff does not dispute this fact.

**172. Jane Porter has never worked as a police officer.**

Plaintiff does not dispute this fact.

**173. Jane Porter is not certified by P.O.S.T. as a police officer in the state of Missouri.**

Plaintiff does not dispute this fact.

**174. Jane Porter made one complaint to the City of Lake Lotawana in 2002 or 2003 that she felt she was being**

65

discriminated against due to her gender with regard to her pay compared to the pay of Police Chief Poletis.

Plaintiff does not dispute that she made one formal complaint in 2002 or 2003, but notes she made an additional formal complaint on July 26, 2006, which was received by the city on July 28, 2006.

**175. Police Chief Poletis had a written contract with the City of Lake Lotawana setting forth his benefits.**

Plaintiff does not dispute this fact.

**176. Patrick Pendergist was born on July 21, 1948. He is presently 60 years of age.**

Plaintiff does not dispute this fact.

**177. Jane Porter believes Public Works Director Patrick Pendergist held a position similar to her.**

Plaintiff does not dispute this fact.

**178. Mr. Pendergist was in charge of the Public Works Department.**

Plaintiff does not dispute this fact.

**179. There are a number of things Mr. Pendergist did in his job that Jane Porter cannot do.**

Plaintiff does not dispute this fact.

66

180. **Mr. Pendergist checked on sewer problems, performed inspections and was licensed by the Missouri Department of Natural Resources.**

Plaintiff does not dispute this fact.

181. **Jane Porter was not licensed by the Missouri Department of Natural Resources.**

Plaintiff does not dispute this fact.

182. **Jane Porter's salary was higher than Patrick Pendergist's salary.**

Plaintiff does not dispute this fact.

183. **Jack Kearse was born on February 20, 1937. He is presently 71 years of age.**

Plaintiff does not dispute this fact.

184. **Rhonda Littrell was the Deputy City Clerk on July 31, 2006. She was subsequently appointed to the position of City Clerk.**

Plaintiff does not dispute this fact.

185. **No one filled the position of Court Administrator and Rhonda Littrell continues to serve in the position of Court Clerk.**

Plaintiff disputes this fact, stating defendant Van Hook terminated the position of Court Administrator in an effort to save the City $400 per month.  The evidence cited by plaintiff

67

confirms defendants' proposed fact and merely explains defendant

Van Hook's reasoning.  This fact is uncontroverted.

**186.  The City of Lake Lotawana first created the position of City Administrator on January 29, 2007, and Bill Kostar was hired to fill that position.**

Plaintiff disputes this fact, citing page 45, line 22 through page 46, line 23 of defendant Van Hook's deposition:

> A:  Well, there was no city administrator.  I was the de facto city administrator, but Jane handled it, so we let her do that.  She handled it very well.
> Q:  What was, in your mind, the city administrator's duties?
> A:  There wasn't one then, but what she did, she managed the office, but technically the mayor should have been doing that.
> Q:  Then why didn't you?
> A:  Because I was an absentee volunteer and it didn't need to be done.
> Q:  So did you believe that the City of Lake Lotawana needed a city administrator at that time?
> A:  To offload her, yes.
> Q:  To keep her from being overworked; is that what you mean?
> A:  That was the contention, that she was overworked.
> Q:  Again, what do you believe the duties would be of a city administrator?
> A:  Much the same as the mayor.  Manage the office, manage personnel.
> Q:  So you believe that the City needed that, but as mayor you didn't do it because you weren't getting paid for it?
> A:  Well, it didn't need to be done.  She was doing that.

This evidence only confirms defendants' proposed fact.  The fact that defendant was the "de facto city administrator" and plaintiff was fulfilling the duties does not controvert

68

defendants' proposed fact that the position was officially created in 2007.

**187. No one replaced Jane Porter with regard to any duties she shared with Patrick Pendergist and Jack Kearse as Zoning Administrator.**

Plaintiff does not dispute this fact.

**188. Toni Burgess began performing the duties of secretary to the Board of Adjustment.**

Plaintiff does not dispute this fact.

**189. Toni Burgess began performing the duties of secretary to the Planning Commission.**

Plaintiff does not dispute this fact.

**190. Jane Porter considers herself to be a public official.**

Plaintiff does not dispute that she considers herself a public official.

**191. Jane Porter claims she was defamed when Art Van Hook told the Board of Aldermen that, "The reason for this meeting is because Jane [Porter] failed to receive an adequate insurance recovery amount on the police car that had been wrecked and was no longer serviceable."**

Plaintiff does not dispute this fact.

**192. This alleged statement occurred at a meeting of the Board of Aldermen in late 2005 or early 2006.**

69

Plaintiff does not dispute this fact.

**193. The only people present at the time of this alleged statement were Mayor Van Hook, Jane Porter, and the members of the Board of Aldermen.**

Plaintiff does not dispute this fact.

**194. It was true that a police car had been wrecked.**

Plaintiff does not dispute this fact.

**195. It was true that the police car was no longer serviceable.**

Plaintiff does not dispute this fact.

196. Jane Porter does not know of any reason to think Art Van Hook did not sincerely believe Porter failed to obtain an adequate insurance recovery on the car.

In support of this fact, defendants cite plaintiff's deposition testimony:

    Q:  And Mr. Van Hook felt you should have gotten the full -
        - whatever - - whatever it would cost to buy a
        replacement car?
    A:  That's correct.
    Q:  Okay.
    A:  A new replacement.  Not an equal to.  A new one.
    Q:  Do you believe he was sincere in that belief, or do you
        think he - - he was making that up for some reason?
    A:  Sincere?  I don't know.  He was mad as all hops.
    Q:  Okay.
    A:  If that's sincere, I guess he was sincere.

(Porter Depo., 217:19-218:7).  Plaintiff disputes this fact, stating plaintiff was uncertain as to defendant Van Hook's sincerity.  I form the same impression after reading the cited

70

testimony; plaintiff was uncertain as to defendant Van Hook's sincerity. This fact remains controverted.

197. The Mayor and the Board of Aldermen were Jane Porter's direct supervisors.

In support of this fact, defendants cite page 218, lines 8-15 of plaintiff's deposition:

    Q:  Okay.  And Mayor Van Hook was one of your supervisors
        when you worked for the City of Lake Lotawana?
    A:  He was my direct boss.
    Q:  And the Board of Aldermen, were they your supervisors
        when you worked for the City of Lake Lotawana?
    A:  Sure.

Plaintiff disputes this fact, citing her testimony that the City Manager does not act at the direction of the Mayor (Porter Depo., 87:8-15). This fact remains controverted.

**198. Jane Porter agrees it is fair for her supervisors to discuss her job performance.**

Plaintiff does not dispute this fact.

**199. Jane Porter also claims she was defamed when Art Van Hook said, "Jane [Porter] is under investigation" and "it may go criminal."**

Plaintiff does not dispute this fact.

**200. Jane Porter believes Art Van Hook made this statement to Aaron Day.**

Plaintiff does not dispute this fact.

71

**201. Jane Porter does not know whether she was under investigation at the time of this alleged statement although she allows she could have been.**

Plaintiff disputes this fact, stating she was still working at the city because Aaron Day told her immediately after defendant Van Hook made the statement (Porter Depo. 227:4-228:25). This evidence does not controvert whether Jane Porter knew if she was under investigation at the time.

**202. Jane Porter has no idea whether it was true that the investigation may go criminal at the time of this alleged statement.**

Plaintiff does not dispute this fact.

**203. Jane Porter claims she was defamed when Art Van Hook told a private citizen not to speak to her because "she was under investigation" and "the company doing the investigation finds another problem each time a file is opened."**

Plaintiff does not dispute this fact.

**204. Jane Porter agrees she was under investigation at the time of this alleged statement.**

Plaintiff does not dispute this fact.

**205. Jane Porter does not know whether the company doing the investigation found another problem each time a file was opened.**

Plaintiff does not dispute this fact.

72

**206.** Jane Porter claims she was defamed when Art Van Hook said, "since Jane [Porter] insisted to the Board of Aldermen the city annex all of the recent areas, problems were created by her overextending the City."

Plaintiff does not dispute this fact.

**207.** Jane Porter believes the alleged statement was made to either Aaron Day or David Echols.

Plaintiff does not dispute this fact.

**208.** The City of Lake Lotawana did annex a number of areas while Jane Porter was employed by the city.

Plaintiff does not dispute this fact.

**209.** The City of Lake Lotawana's annexation created problems in the form of the litigation that ensued.

Plaintiff does not dispute this fact.

**210.** The problems caused by the annexation overextended the city.

Plaintiff does not dispute this fact.

**211.** Jane Porter cannot identify any specific way in which she was held up to scorn or contempt because of this alleged statement.

Plaintiff disputes this fact, stating that at a minimum she spoke to Russ Pulley at the Kansas City Star regarding defendant Van Hook's false statement that the City of Lake Lotawana missed

73

all of the 2006 road funds because of her inaction (Porter Depo. 246:2-13). The evidence plaintiff cited concerns another alleged statement (i.e., defendant Van Hook's October 4, 2006, e-mail). I find this fact to be uncontroverted.

**212. Jane Porter claims she was defamed when Art Van Hook stated, after being asked why other city officials were not being investigated, "Well, at least they did not steal any money from the City."**

Plaintiff does not dispute this fact.

**213. This alleged statement occurred in the lobby of City Hall after a meeting had been adjourned.**

Plaintiff does not dispute this fact.

**214. This alleged statement was made to Alderman Lenda Harter, possibly Alderman D. J. Harter, and two other unknown persons.**

Plaintiff does not dispute this fact.

**215. Jane Porter is not aware of anyone who has ridiculed her or held her up to scorn because of this alleged statement.**

Plaintiff does not dispute this fact.

**216. Jane Porter claims she was defamed when Art Van Hook wrote in an October 4, 2006, e-mail that, "In case you haven't heard .... Among other things, Mrs. Porter never registered the**

74

City's 1/8 cent sales tax with the State or County, consequently, we missed all 2006 road funds!"

Plaintiff does not dispute this fact.

**217. Jane Porter believes the recipients of the e-mail were Jane Porter, the six Aldermen and Homeowner's Association President Tom Wadell.**

Plaintiff does not dispute this fact.

**218. The actual recipients were the six Aldermen.**

Plaintiff does not dispute this fact.

**219. Jane Porter does not know whether the City of Lake Lotawana missed all 2006 road funds.**

Plaintiff does not dispute this fact.

**220. Jane Porter was the one who prepared the paperwork to register the sales tax and she sent it to the state.**

In support of this fact, defendants cite page 178, lines 11-19 of plaintiff's deposition:

> Q:   Okay.  And whose responsibility is it  - - is it to
>      send that into the state?
> A:   Well, you know, it - - basically it is the major and
>      Aldermen, but as city clerk, I'm sure that I was taking
>      care of that.
> Q:   Okay.  And did you send in whatever paperwork was
>      necessary to the state to register the sales tax?
> A:   Yes.

Plaintiff disputes this fact, citing the same evidence to say it was not her responsibility.  Regardless of whose

75

responsibility it was, plaintiff testified that she sent the
sales tax paperwork to the state.  This fact is uncontroverted.

221. Jane Porter agrees it is possible she made a mistake in
sending in the sales tax paperwork.

In support of this proposed fact, defendants cite
plaintiff's deposition testimony:

> Q:   Do you agree that the sales tax was not registered in -
> - for what - - I'm not saying you didn't send in your
> paperwork.  I'm just saying, do you agree there was
> some problem that kept the city from getting money as
> soon as it possibly could?
> A:   Sir, I don't have any idea.
> Q:   Okay.  Is it possible that you made some mistake in
> sending in that paperwork?
> A:   Oh, I guess anything's possible.

(Porter Depo., 180:24-181:8).  I do not read plaintiff's
statement that "anything's possible" to be an agreement that she
could have made a mistake.  In fact, the deposition testimony
cited by plaintiff shows that plaintiff believed she had
correctly sent in the paperwork:

> A:   I sent to them a copy of the ordinance, a copy of the
> election certification, and a copy of - - let me think.
> What else?  You know, sir, I can't think what the other
> one was.
> Q:   Okay.
> A:   I - - I don't remember at this point.
> Q:   And when did you send all this stuff to the Department
> of Revenue?
> A:   Oh, and you have to send a list of your businesses.
> That was the other thing.  First part of - - of '06.
> Q:   And did you do anything else with regard to registering
> the sales tax with the Department of Revenue?
> A:   No, sir.  That's - - what I did was what I was - - what
> I had read that I was supposed to.  I talked to the
> Department of Revenue.  They confirmed.

76

```
Q:    Okay.  Is there a cover letter or something that you
      prepared sending all this stuff in?
A:    Uh-huh.  There was.
Q:    Do you have a copy of it yourself personally?
A:    No.
Q:    Okay.  Do you think there should be a copy somewhere in
      city hall?
A:    There was when I left there.  I'm sure there isn't now.
Q:    Where was it filed away when you left?
A:    In the office that I occupied in a file folder marked
      Sales Tax 1/8 cent.
Q:    Was that in a filing cabinet - -
A:    Yes, sir.
Q:     - - or where was it?  And where is the filing cabinet
      located in your office?
A:    When I left there, it was located - - here.  I'm
      sitting at my desk, it would be to my right against
      that wall.
```

I find this fact remains controverted.

**222. The City of Lake Lotawana did miss the 2006 road funds from the sales tax.**

Plaintiff does not dispute this fact.

**223. Jane Porter is not aware of anyone who ridiculed her or held her up to scorn as a result of Art Van Hook's e-mail.**

In support of this fact, defendants cite plaintiff's deposition testimony:

```
Q:    Okay.  Are you aware of anyone who ridiculed you or
      held you up to scorn because of Mr. Van Hook's October
      4, 2006, e-mail?
A:    Well, strangely enough, I found - - I had a call from
      the Kansas City Star, Russ - -
Q:    Pulley?
A:    Yeah.  Thank you.  Asking me if I had seen it and was
      it true.  And I said, yes, I had, and as far as I knew,
      not.
Q:    Okay.  Did the Kansas City Star publish anything about
      that e-mail?
A:    I don't know, sir.  I don't take the Star.
```

77

```
Q:    Okay.  So are you aware of anyone who ridiculed you or
      held you upon to scorn because of Mr. Van Hook's e-
      mail?
A:    No.  I can't give you a name.
```

(Porter Depo., 246:2-17).

Plaintiff controverts this fact, pointing out that Van Hook's statement, to the effect that the City of Lake Lotawana missed its tax revenues because of plaintiff, was published in the Kansas City Star (Porter Depo. 178:20-24).  I initially note that plaintiff's deposition testimony in the lines cited do not reference where the statement was published.  My own reading of surrounding pages reveals it was published in the Lake Lotawana News (Doc. No. 182:19-183:5).  Defendant Van Hook's e-mail and statement to the newspaper appear to be two different events.  Regardless, the publishing of a statement is very different than being ridiculed or scorned as a result of such publishing.  I find this fact to be uncontroverted.

**224. Jane Porter claims she was defamed when Art Van Hook wrote an e-mail on October 9, 2006, stating, "Here's another one, R-56 and R-57 was [sic] replatted into one lot in October of 2004.  Mrs. Porter never sent it to the BOA! Owner is not a happy camper ... ."**

Plaintiff does not dispute this fact.

78

**225. Jane Porter does not know [to] who[m] Art Van Hook allegedly sent this e-mail, although she speculates it was sent to the Board of Aldermen.**

Plaintiff does not dispute this fact.

**226. Jane Porter does not know whether R-56 and R-57 were re-platted into one lot in October of 2004.**

Plaintiff does not dispute this fact.

**227. Jane Porter does not know whether the owner of these properties was not a "happy camper."**

Plaintiff does not dispute this fact.

**228. Jane Porter is not aware of anyone who ridiculed her or held her up to contempt because of Art Van Hook's October 9, 2006, e-mail.**

Plaintiff does not dispute this fact.

**229. Jane Porter believes Art Van Hook's motive was that he wanted her gone.**

Plaintiff disputes this fact, stating defendant Van Hook told Lenda Harter that "he wanted to get Jane Porter terminated" (L. Harter Depo., 14:11-24). This supports rather than controverts defendants' proposed fact.

**230. Jane Porter believes Art Van Hook was using her as his scapegoat because things were really screwed up and he was looking for someone to blame it on.**

Plaintiff disputes this fact, stating Linda Harter believed defendant Van Hook wanted to terminate plaintiff in an effort to "cover up something he had done" (L. Harter Depo., 18:13-22:1). This evidence does not controvert defendants' proposed fact concerning plaintiff's belief. I find this fact to be uncontroverted.

**231. Jane Porter believes Art Van Hook was using her as a scapegoat for the problems caused by the annexation.**

Plaintiff does not dispute this fact.

**232. Jane Porter told her husband that she believes the reason she was discharged was because Art Van Hook "pissed away" Lake Lotawana's money and he needed someone to blame it on.**

Plaintiff does not dispute this fact.

**233. Jane Porter also told her husband that she believes the reason she was discharged is because Art Van Hook was afraid he would be impeached and he needed someone to blame.**

Plaintiff does not dispute this fact.

**234. Bill Kostar was born on March 11, 1944. He is presently 64 years of age.**

Plaintiff does not dispute this fact.

**235. Bill Kostar is presently the Lake Lotawana City Administrator.**

Plaintiff does not dispute this fact.

**236. The City Administrator position was created in January 2007 and there was no City Administrator when Jane Porter was employed.**

Plaintiff disputes this fact, although she concedes that the statement is officially correct. I have reviewed the evidence cited by the parties, and find this fact to be uncontroverted. See also defendants' proposed fact number 186.

**237. Jane Porter did not have a written contract with the City of Lake Lotawana.**

Plaintiff disputes this fact, stating it calls for a legal conclusion. Plaintiff also states she was reappointed for a one-year term on May 24, 2006. This evidence does not controvert defendants' proposed fact.

**238. There was never a vote to ratify any contract Jane Porter might have with the City of Lake Lotawana.**

Plaintiff disputes this fact, stating it calls for a legal conclusion. Plaintiff also states she was appointed for an one-year term on May 24, 2006, and that it was the city's practice to pay her in accordance with the verbal contract that had been in place for years. This evidence does not controvert defendants' proposed fact.

239. The City of Lake Lotawana has never employed twenty or more employees at any one time.

Plaintiff disputes this fact. To controvert defendants' proposed fact she cites defendant Van Hook's deposition in which he stated he had a staff "of some 20, 25 people." This fact remains controverted.

**240. Jane Porter owed a fiduciary duty to the City of Lake Lotawana.**

Plaintiff does not dispute this fact.

241. Jane Porter breached her fiduciary duty to the City of Lake Lotawana.

In support of this fact, defendants offer the affidavit of their expert Thomas Mullane (Exh. Z). In the affidavit, Mr. Mullane testifies he believes plaintiff breached her fiduciary duty to the City of Lake Lotawana.

Plaintiff disputes this fact, stating it calls for a legal conclusion. I agree. Expert opinions that amount to legal conclusions are inadmissible. See In re Acceptance Ins. Co. Sec. Lit., 423 F.3d 899, 905 (8th Cir. 2005); Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc., 320 F.3d 838, 841 (8th Cir. 2003); Peterson v. City of Plymouth, 60 F.3d 469, 475 (8th Cir. 1995); Estes v. Moore, 993 F.2d 161, 163 (8th Cir. 1993). Because inadmissible evidence shall not be considered on summary judgment, this will not be considered an uncontroverted fact.

82

## IV. ADDITIONAL UNCONTROVERTED FACTS

In her response, plaintiff offered additional uncontroverted facts. Below, the facts typed in bold are those that I find to be undisputed based on the admissible evidence before me.

**242. Jane Porter was born on January 5, 1949.**

Defendants do not dispute this fact.

**243. Jane Porter began working as a part-time city clerk for the City of Lake Lotawana beginning in 1996, and became a full-time employee in 1998.**

Defendants do not dispute this fact.

**244. Between 1998 and 2006, Jane Porter held various job titles with the City of Lake Lotawana, including but not limited to the appointed positions of City Clerk, Court Clerk, and Court Administrator.**

Defendants do not dispute this fact.

**245. On May 24, 2006, the Board of Aldermen voted to appoint Jane Porter as City Clerk for the period of one year. On May 25, 2006, Art Van Hook placed Porter on administrative leave without the consent of the Board because Van Hook was concerned that Porter was shredding city documents, but Van Hook declined to share this information with the Board of Aldermen before the Board voted to retain Porter.**

Defendants do not dispute this fact.

83

**246. Jane Porter was an appointive officer.**

In support of her proposed fact, plaintiff cites page 189, lines 2-21. This evidence does not support plaintiff's fact. However, defendants' proposed facts numbers 184, 244 and 245, which were found to be uncontroverted, refer to plaintiff as an appointive officer. Accordingly, this fact is uncontroverted.

**247. Prior to initiating the Meara King investigation in the spring of 2006, Art Van Hook "had the utmost confidence in [Jane Porter]."**

Defendants do not dispute that defendant Van Hook previously had the utmost confidence in plaintiff; however, they state the evidence cited by plaintiff in support of this fact does not reference the precise time period when defendant Van Hook lost confidence. I find this fact to be uncontroverted, but note defendants' objection.

**248. The initial meeting between Toni Burgess, Rhonda Littrell, and Art Van Hook in** the Spring of **2006 was "the only serious [complaint]" Van Hook ever received about Jane Porter as an employee.**

Defendants do not dispute that the complaints made by Ms. Littrell and Ms. Burgess were the first serious complaints made to defendant Van Hook about Jane Porter, but controvert the fact to the extent that it implies other less serious complaints had not been made. Plaintiff's fact references a "serious

84

complaint." The testimony cited by plaintiff does not, however, reference a time frame. In light of defendants' proposed fact number 56 (referencing meeting in January of 2006), which was found to be uncontroverted, I find only the portions of this fact typeset in bold to be uncontroverted.

**249. Art Van Hook unilaterally hired an external accounting firm, Meara King, to perform a forensic accounting of Jane Porter without getting the necessary approval from the Board of Aldermen.**

Defendants do not dispute that defendant Van Hook hired Meara King to perform a forensic review of Lake Lotawana's records.

250. Acting on his own initiative, Art Van Hook hired Meara King to investigate Jane Porter's alleged time card violation.

Defendants dispute this fact stating, <u>inter</u> <u>alia</u>, that it was Meara King that discovered the time card violation:

    Q: What problem did you notice then?
    A: This was after the Meara King investigation, and we
       started looking at all the records very carefully, and
       she was charging time for vacation.  She was accruing
       time for vacation that she wasn't entitled to, and then
       she would pay herself for the vacation in direct
       violation of the code.

(Van Hook Depo., 62:10-16). This fact remains controverted.

**251. As a Mayor of a Fourth Class City, Art Van Hook had no authority to bind the City of Lake Lotawana into agreements with third parties.**

85

Defendants do not dispute this fact.

252. The Board of Aldermen never voted to enter into an agreement to have Meara King perform a forensic audit of the City of Lake Lotawana.

In support of this fact, plaintiff cites defendant Van Hook's deposition testimony:

> Q: The board didn't direct you to hire Meara King?
> A: I think I got their approval after the fact.
> Q: At the time you hired them you didn't have board approval?
> A: I believe that's correct.

Defendants object on the ground that the cited testimony does not support the proposed fact. Defendants' objection is sustained; plaintiff's proposed fact states that the Board of Aldermen <u>never</u> voted to enter an agreement with Meara King, whereas the cited deposition testimony defendant Van Hook stated he believed he had obtained the Board of Aldermen's approval after the fact. I find this fact remains controverted.

**253. On May 24, 2006, the Board of Aldermen** unanimously **voted to reappoint Jane Porter to the position of City Clerk for another year.**

Defendants object on grounds that the cited testimony does not reference that the vote was unanimous. I agree; the testimony merely states that the Board of Aldermen voted to reappoint plaintiff. Accordingly, I find the portion of this fact typeset in bold to be uncontroverted.

86

**254. On May 25, 2006, Art Van Hook notified Jane Porter that he was placing her on paid leave, and that she "will have the opportunity to address all findings to the full Board of Aldermen."**

Defendants do not dispute this fact.

255. On June 15, 2006, Mayor Van Hook never expressed any concerns to the Board of Alderman about not being able to access city funds in order to pay city personnel during the Board of Aldermen meetings on May 24, 2006; June 6, 2006; or June 20, 2006, instead using this forum to discuss the possibility of moving the meeting time forward a half an hour, city dog ordinances, and other minutia.

In support of this proposed fact, plaintiff cites Exhibit LL. My review of this exhibit does not reveal any minutes from a June 15, 2006, meeting. This fact thus remains controverted.

256. According to current City Administrator Bill Kostar, the Meara King investigation failed to determine that Porter improperly took vacation time, rather it merely reported "a concern as to the amount of bank accounts there seemed to be."

In support of this fact, plaintiff cites Exhibit PP. Exhibit PP is the September 18, 2007, minutes from the City of Lake Lotawana's Board of Aldermen meeting. Page two of the September 18, 2007, minutes state:

87

Mr. Kostar stated that [Meara King] did a forensic audit. Alderman L. Harter stated it took four (4) months and there was no existing report. The City did not get anything out of the investigation so nothing should be paid. She asked Mr. Kostar what was found and he said "nothing; only a concern as to the amount of bank accounts there seemed to be.

This evidence is hearsay within hearsay. The minutes themselves are admissible under the public records exception to the hearsay rule. <u>See</u> Fed. R. Evid. 803(8). However, Mr. Kostar's statement found within the minutes remains hearsay. I find this fact remains controverted.

257. Jane Porter never had "the opportunity to address all findings [of the Meara King investigation] to the full Board of Alderman."

In support of this fact, plaintiff cites the letter from defendant Van Hook to plaintiff informing her she was being placed on paid leave and stating she would have an opportunity to address all findings to the full Board of Aldermen after the investigation was complete. Plaintiff also cites page 34, lines 3-14 of Lenda Harter's deposition:

> So did Mr. Van Hook ever tell the - - did he ever tell you that Jane would be given an opportunity to address the full Board of Aldermen after this investigative process?
>
> A: Jane e-mailed this to me and so at the meeting I highlighted that sentence there where she was to be given the opportunity and I made copies for all the aldermen and the mayor and I handed it out and I said, Where is her justice and there was nothing said.

88

This evidence does not support plaintiff's proposed fact that she was never given an opportunity to address the Board. I find this fact remains controverted.

**258. On his own initiative, Art Van Hook suggested terminating Jane Porter to the Board of Aldermen.**

Defendants do not dispute this fact.

**259. The Board of Aldermen initially voted to terminate Jane Porter on July 28, 2006, but upon advice of counsel, this vote was determined to be void due to the abstention.**

Defendants do not dispute this fact.

**260. The Board of Aldermen held [a] subsequent vote on July 31, 2006, when three members of the Board voted to retain Porter and three voted to terminate her.**

Defendants do not dispute this fact.

**261. The three members of the Board of Aldermen who voted to remove Porter were Rob Reid, Mark Pfefferkorn, and Tom Meyers.**

Defendants do not dispute this fact.

**262. The three members of the Board of Aldermen who voted to retain Jane Porter were D.J. Harter, Linda Harter, and Jim Kennard.**

Defendants do not dispute this fact.

**263. Art Van Hook acted as the tie-breaking vote in the decision to terminate Jane Porter.**

Defendants do not dispute this fact.

**264. The Municipal Code of the City of Lake Lotawana requires a two-thirds vote of members elected to the Board of Aldermen to remove an appointed officer.**

Defendants dispute this fact, providing the language of § 115.040 that pertains to appointed officers.  I find this proposed fact to be uncontroverted, but also note that an appointive officer may be removed at will by the mayor with the consent of a majority of all elected members.  See also defendants' proposed fact number 132.

**265. Only half of the members elected to the Board of Aldermen voted to remove Jane Porter.**

Defendants do not dispute that three members voted to terminate plaintiff and three members voted not to terminate her.

**266. The Discipline Policy established by the Code of the City of Lake Lotawana requires department heads to follow a four-step disciplinary procedure: (1) warning (2) demotion, (3) suspension and (4) removal.**

Defendants dispute this fact on grounds that § 140.110 is not contained within Exhibit GG. While this is true, the government code is attached in full as part of Exhibit U.  This fact is uncontroverted.

267. Art Van Hook never demoted Jane Porter.

90

In support of this fact, plaintiff cites page 189, lines 2–10 of defendant Van Hook's deposition:

> Q:    Now, do you believe as Jane Porter's supervisor that you could have implemented this disciplinary policy as laid out in Section 141.110?
> A:    Up to point 4.
> Q:    You couldn't remove her from office?
> A:    That's correct.
> Q:    So whenever she was terminated, this isn't the section that was followed?
> A:    That is the section that was followed.

This testimony does not support plaintiff's proposed fact. Accordingly, this fact remains controverted.

268. Art Van Hook "stretched" city ordinances in order to get the Board of Aldermen to vote on terminating Jane Porter.

In support of this fact, plaintiff cites the following testimony from defendant Van Hook's deposition:

> A:    This part does.  You have to do a warning, demotion, and suspension.
> Q:    Was all that done?
> A:    I think so.  Perhaps item 3 wasn't, unless you consider eliminating one position.
> Q:    Well, when was there a warning?
> A:    We had a meeting with Mr. Cook; we had a meeting with Rob Reid twice, I think; I spoke to her about using credit cards; I then spoke to her about cheating on the time cards, but that's  -- that was kind of after the fact.
> Q:    What do you mean, it was after the fact?
> A:    I didn't catch all that until after the fact, until way into -- that's not true.  That was caught on the first day of the forensic audit.  I don't think I ever brought that to her attention.
> Q:    When you say cheating on time cards, what do you mean by that?
> A:    She was double-dipping on her paycheck.
> Q:    On the paying vacation time?
> A:    That and accruing hours.  She was a salaried position. There [are] no hours.  She would accrue hours and take

91

vacation based on those hours, even though she didn't
work those hours, and then she would pay herself for
that vacation.

Q: Which you were aware of?

A: Yes.

Q: And apparently did nothing about?

A: No. No, sir, that's not true. I wasn't aware of that
until the first day of the forensic audit.

Q: Really? Because earlier when I asked you about if you
were aware Randy Poletis was doing that, you said he
was.

A: Randy Poletis was not double-dipping. He was getting
paid for vacation. I am talking about coming in and
working for eight hours, spending another eight hours
for whatever function you are doing, and then
accumulate that whole time as being on the job and then
paying yourself back, actually getting money for those
hours; not once, but a lot.

Q: Now, which part of that was Jane Porter doing that was
improper?

A: Well, if you are paid on salary, you work as many hours
as it takes. That's how you get compensated. But to
go in there and work eight hours and maybe work a few
other hours, turn that time in to get paid, instead of
taking the pay, I turn that back into vacation time and
then pay - - and then reimburse myself for that pay.

Q: But you knew that was happening?

A: I did not know that was happening, not until the first
day of the forensic audit.

Q: But you signed the checks.

A: I didn't read the ADP reports. I never even saw one
until the audit started.

Q: Okay. So you believe that Ms. Porter was given a
warning?

A: Yes.

Q: And that she was demoted?

A: That might be stretching it, by removing that one
position.

Q: Yeah. Earlier you testified that you did that to save
money and to keep her from being so overworked.

A: Yeah. Yeah.

Q: All right. We know about her suspension?

A: Okay.

Q: And then she was removed?

A: That's correct.

Q: And being an appointed officer, wouldn't she have to be
removed consistent with the section that says "Removal
of Officers"?

92

```
A:    That's correct.
Q:    Isn't that done by the Board of Aldermen?
A:    That's correct.
Q:    Okay.  And so it's your testimony here today that the
      Board of Aldermen removed her consistent with Section
      115.040?
A:    115.040.
Q:    Page 19?
A:    Yes, sir.
Q:    Well, you are the one who brought her removal to the
      board; is that correct?
A:    I presented the evidence.  Actually I was there
      presiding when Meara King presented the evidence.
```

I have read the evidence cited by plaintiff and find it does not support this proposed fact.  This fact thus remains controverted.

**269.  Lotawana's attorney, Jim Cook, acknowledged via email that he received Jane Porter's complaint of age discrimination, gender discrimination, and a hostile work environment on July 28, 2006 at 8:50 a.m.**

Defendants do not dispute this fact.

**270.  Between placing Jane Porter on administrative leave and the vote to terminate Porter, on or about June 15, 2006, Art Van Hook submitted ten written questions to Jane Porter.**

Defendants do not dispute this fact.

**271.  Jane Porter responded that she thought the questions were "very simple," and that she would answer the questions if she could set up a meeting with counsel present.**

In support of this proposed fact, plaintiff cites her June 19, 2006, letter to Jim Cook in which she stated, "The questions

93

the Mayor asked seem very simple and I believe ALL of them can easily be addressed when a mutually satisfactory meeting is scheduled for all parties concerned." This fact is uncontroverted.

**272. Art Van Hook did not feel obligated to set up this meeting with Jane Porter.**

Defendants do not dispute this fact.

**273. Art Van Hook blamed failure to make payroll in June 2006 on not having answers to his written questions.**

Defendants do not dispute this fact.

**274. Yet, Mayor Van Hook never expressed any concerns to the Board of Aldermen about not being able to access city funds in order to pay city personnel during the Board of Aldermen meetings on May 24, 2006; June 6, 2006; or June 20, 2006. There is absolutely no mention of any potential payroll problems in the minutes of the City Aldermen meetings for these dates.**

In support of this fact, plaintiff cites Exhibit LL, which includes minutes from various City of Lake Lotawana's Board of Aldermen meetings. Defendants object to this fact, stating that (1) an executive meeting was held prior to the public meeting on May 24, 2006, (2) the June 6, 2006, meeting was a "Special" meeting and thus for a specific purpose, and (3) the June 20, 2006, meeting involved an executive meeting. Additionally, bills and disbursements were discussed at the June 20, 2006, meeting.

94

This evidence does not show that defendant Van Hook expressed any concerns regarding payroll. Furthermore, my review of the minutes does not reveal discussion of any potential payroll problems. This fact is uncontroverted.

**275. In his response to Jane Porter's request for unemployment benefits**, which was ultimately granted upon a finding of no wrongdoing, **Art Van Hook stated that "I discharged her [for not responding to Van Hook's written questions]. The discharge was because the claimant was not providing information requested."**

Defendants object to this fact, stating whether plaintiff received unemployment benefits is irrelevant to the claims in the instant lawsuit. Defendants cite Missouri Revised Statute § 288.215(1), which states:

> Any finding of fact, conclusion of law, judgment or order made by an appeals tribunal, the labor and industrial relations commission or any person with the authority to make findings of fact or law in any proceeding under this chapter shall not be conclusive or binding in any separate or subsequent action not brought under this chapter, and shall not be used as evidence in any subsequent or separate action not brought under this chapter, before an arbitrator, commissioner, commission, administrative law judge, judge or court of this state or of the United States, regardless of whether the prior action was between the same or related parties or involved the same facts.

My reading of this statute indicates it applies to findings of fact, conclusions of law, and judgments or orders made by an appeals tribunal, the labor and industrial relations commission,

95

or any person with the authority to make findings of fact or law. The quote in plaintiff's proposed fact is taken from a deputy's recitation of defendant Van Hook's statement, which does not fall within any of the requisite categories.

The emboldened portion of the proposed fact is undisputed; however, it merely states that Van Hook's response included the quoted statement. This fact does not establish that plaintiff was guilty of no wrongdoing, as (1) the individuals who decide whether plaintiff gets unemployment benefits did not have all of the facts of this case before them, (2) their decision is not binding on this court, (3) the statement is hearsay, and (4) the statement constitutes an opinion as to the ultimate legal conclusion in this case.

**276. After interviewing Van Horn on the phone, the hearing off[icer] wrote a handwritten note stating "[t]he misuse of the City credit card in December 2005 was not the reason for discharge."**

Defendants dispute this fact, stating whether plaintiff received unemployment benefits is irrelevant to the claims in the instant lawsuit. Defendants cite Missouri Revise Statute § 288.215(1), quoted above, and also object on grounds that the cited statement is hearsay. The proposed fact is not offered to prove that plaintiff was not discharged due to misuse of her city

Case 4:07-cv-00461-REL   Document 131   Filed 03/31/09   Page 96 of 137

credit card. The statement merely says that a hearing officer wrote this note.

277. The defendants now claim that misuse of the city credit card is the reason for Porter's termination.

In support of this fact, plaintiff cites defendants' proposed facts numbers 124, 133 and 136, which were all found to be uncontroverted. Defendants' proposed fact number 124 reads, "The Board of Aldermen was also presented with evidence that Jane Porter had used City credit cards to purchase 'liquor and jewelry and food and this type of thing and she had bought a blouse with that card ... .'" Defendants' proposed fact number 133 reads, "Rob Reid's vote to discharge Jane Porter was based on the credit card records that he personally reviewed, his sincere belief that Porter had purchased personal items with the City credit card, and the findings that Meara King reported." Finally, defendants' proposed fact number 136 reads, "Mark Pfefferkorn testified, "I think the fact that she used a corporate credit card for personal use is enough to get fired in any business. It would be in mine."

Defendants dispute this fact, arguing that they do not claim that misuse of the city's credit cards was the only reason for plaintiff's termination. They cite page 209, lines 2-20 of defendant Van Hook's deposition in support of their position:

    Q:  Well, you testified earlier that she was fired for
         insubordination.  Do you recall that?
    A:  Yeah, but not exclusively for insubordination.

```
Q:    Okay.  If she would have provided you with answers to
      those ten questions, is it your testimony she still - -
      or that she would not have been terminated?
         MR. MIZNER: Same objection
Q:    (By Mr. Powell) Are you going to answer, sir?
         MR. MIZNER: If you can answer it, then go ahead.
A:    Well, I would have to make a decision on that depending
      on what the answers were.  At the time the City was in
      serious financial plight, and it wasn't that serious
      until she left.  We were lost.  Where is the money?  I
      had a staff of some 20, 25 people, couldn't pay them.
```

This testimony establishes that there was more than one reason plaintiff was terminated.  I thus find this fact remains controverted.

**278.  During his deposition, Art Van Hook stated the reason for Jane Porter's termination was "double-dipping in the payroll" and the general poor conditions of Lotawana's city records.**

Defendants do not dispute that these were part of the reasons.

279. It is well documented that Art Van Hook improperly took possession of the city records, and restricted Jane Porter's access to those records, even though Jane Porter was the custodian of the city's records.

In support of this proposed fact, plaintiff cites page 68, line 18 through page 72, line 25 of defendant Van Hook's deposition.  My review reveals that the cited testimony does not support plaintiff's proposed fact.  This fact remains controverted.

98

280. During the September 18, 2007, Board of Aldermen meeting, the current City Administrator for the City of Lake Lotawana said the Meara King investigation found "nothing; only a concern as to the amount of bank accounts there seemed to be."

In support of this fact, plaintiff cites Exhibit PP. Exhibit PP is the September 18, 2007, minutes from the City of Lake Lotawana's Board of Aldermen meeting.  Page two of the September 18, 2007, minutes state:

> Mr. Kostar stated that [Meara King] did a forensic audit. Alderman L. Harter stated it took four (4) months and there was no existing report.  The City did not get anything out of the investigation so nothing should be paid.  She asked Mr. Kostar what was found and he said "nothing; only a concern as to the amount of bank accounts there seemed to be."

This evidence is hearsay within hearsay.  The minutes themselves are admissible under the public records exception to the hearsay rule.  <u>See</u> Fed. R. Evid. 803(8).  However, Mr. Kostar's statement found within the minutes remains hearsay.  I find this fact to remain controverted.

**281. Van Hook told [a person]** inside and **outside the City of Lake Lotawana office complex that the Meara King investigation into Lotawana's city records "may go criminal."**

In support of this fact, plaintiff cites defendant Van Hook's testimony:

> Q: Do you ever recall telling others outside the office that Jane was under investigation?
> A: Yes.

99

```
Q:   Who?
A:   My wife.
Q:   Anyone besides your wife?
A:   I am sure I did, but I can't recall who.
Q:   Well, do you recall following up by stating that it may
     go criminal?
A:   Yes.
Q:   Who did you say that to?
A:   Aaron Day.
Q:   Do you recall when you said that?
A:   No.
Q:   It was during the pending investigation?
A:   It was early in the investigation, yes.
```

(Van Hook Depo., 254:1-16). Defendants object, stating defendant

Van Hook told one person that it may go criminal. My reading of

the cited testimony also reveals that defendant Van Hook only

told Aaron Day. As a result, only the portion of the proposed

fact typeset in bold is uncontroverted.

282. In front of the Board of Aldermen, Art Van Hook said

Jane Porter was "stealing from the company or the city."

Defendants dispute this fact, citing page 15, lines 8-16 of

Lenda Harter's deposition:

```
Q:   And at that meeting, Art Van Hook said to the whole
     Board of Aldermen that Jane Porter is stealing from the
     city?
A:   He didn't used the word - - he used taking money from
     the city.
Q:   Unauthorized use of city funds  - -
A:   Yes.
Q:    - - was what he was talking about?
A:   Yes.
```

Due to the discrepancy of the quoted material, this proposed

fact remains controverted.

283. Art Van Hook caused false information to be published in a newspaper.

Defendants dispute this fact. In support of this fact, plaintiff cites testimony from her deposition:

> Q:  Okay.  Are you aware that there was some problem with the registration of the sales tax?
> A:  I know that the mayor put it in the paper that I caused them to lose money, which was an outright lie.

(Porter Depo., 178:20-24).  To controvert this fact, defendants refer the court to fact numbers 220 and 221, in which it was found to be uncontroverted that the City of Lake Lotawana did miss the 2006 road funds from the sales tax and that plaintiff prepared the paperwork.  This proposed fact remains controverted.

284. As a result of wrongfully terminating Jane Porter, Porter lost $2,800 in past wages and ongoing future lost wages.

Defendants object to this fact, arguing it calls for a legal opinion or conclusion.

In support of this fact, plaintiff cites to a letter she wrote to City Attorney James Cook wherein she stated, "Through the pay period of August 1, 2006, an additional $2,800 is currently still legally due me, as was confirmed by my recent reappointment to City Clerk."  (Exh. JJ).  She also cites to her deposition where she testified she is currently earning approximately $20,000 less per year (Porter Depo., 113:23-114:17).

101

Because the only thing plaintiff points to is her own allegation, this fact remains in dispute.

285. Porter was denied benefits and compensation in the form of vacation time, sick leave, and comp time that was paid to the other department heads, Randy Poletis and Patrick Pendergist, both males.

Defendants dispute this fact on grounds that plaintiff was not similarly situated to Police Chief Poletis or Public Works Director Pendergist. I have reviewed the cited testimony from Mr. Pendergist's deposition (37:17-43:23). Although the testimony states Mr. Pendergist was paid for vacation and comp time, it says nothing concerning Police Chief Poletis or plaintiff. This fact remains controverted.

286. Both Pendergist and Poletis received paid vacation and comp time, yet Porter was investigated for receiving benefits for the same, while neither of them were.

In support of this fact, plaintiff cites page 219, line 19 through 220, line 11 of defendant Van Hook's deposition:

> Q: Well, were you withholding $2,800 form her pay?
> A: I paid her her salary on advice of the City attorney; only paid her her salary, not for the extra duties that she wasn't doing.
> Q: So that was what you did; you paid her her salary?
> A: Yes.
> Q: What about her unpaid vacation/sick leave time; did she receive any compensation from that?
> A: In my opinion, she didn't have any coming. She was cheating on the time cards so egregiously that it was just - - it was inappropriate.
> Q: You made that determination on your own?

102

```
A:    Not to pay it?
Q:    Yeah.
A:    I didn't get that demand.  I did not make that
      decision, but I would have.
```

This testimony does not support plaintiff's proposed fact; as a result, I find it remains controverted.

287. Randy Poletis and Patrick Pendergist received comp and vacation time, and ultimately, Jane Porter was denied the same.

Defendants dispute this fact, maintaining that plaintiff was not similarly situated to Police Chief Poletis or Public Works director Pendergist.  This does not controvert this fact. However, the evidence cited by plaintiff does not support this fact.  There is no evidence of Chief Poletis receiving vacation or comp time.  Pendergist testified that he received money for unused vacation and comp time when he quit.  Van Hook testified that he was not asked to pay plaintiff for vacation or comp time.

**288. The City of Lake Lotawana purchased an insurance agreement that will indemnify [in whole or in part] any judgments plaintiff may obtain.**

Defendants dispute this fact.

In support of this fact, plaintiff cites to defendant City of Lake Lotawana's interrogatory response in which it states it has an insurance agreement that would indemnify in whole, or in part, against any judgment obtained by plaintiff (Exh. EE).

To dispute this fact, defendants cite to the applicable Memorandum of Coverage (Exh. WW). Defendants specifically refer to the language contained in the "Defense" portion of the memorandum which provides:

> Nothing contained in this section, or the balance of this document, shall be construed to broaden the liability of the Member Agency beyond the provisions of sections 537.600 to 537.610 of the Missouri statutes, nor to abolish or waive any defense at law which might otherwise be available to the Member Agency or its officers and employees.

This does not call into question the proposed fact, with the added bracketed language. The proposed fact does not indicate that the insurance broadens the city's liability. I find this fact undisputed.

289. The City of Lake Lotawana insurance agreement will indemnify defendant Art Van Hook for any judgment plaintiff may obtain for his acts performed within the course and scope of his employment as Mayor of the City of Lake Lotawana.

Plaintiff has not cited any evidence in support of this fact. Accordingly, I find this proposed fact to remain controverted.

## V.    *ANALYSIS*

Because plaintiff concedes she has no cause of action against defendant Van Hook on Counts I, II, and III, judgment will be entered in favor of Van Hook on those three counts. As a result, the following counts of plaintiff's complaint remain: Count I (violations of the ADEA) against defendant City of Lake

104

Lotawana; Count II (sex discrimination) against defendant City of Lake Lotawana; Count III (retaliation) against defendant City of Lake Lotawana; Count IV (violations of the MHRA) against both defendants; Count V (wrongful termination) against both defendants; and Count VI (defamation) against both defendants. Defendant City of Lake Lotawana's counterclaim against plaintiff contains one count for breach of fiduciary duty. Defendants move for summary judgment on all counts of plaintiff's complaint as well as on the issue of liability on defendant City of Lake Lotawana's counterclaim. Each will be addressed in turn.

**A. *AGE DISCRIMINATION CLAIM***

Because there is no direct evidence of age discrimination, the burden-shifting scheme developed by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), applies to this case. Therefore, plaintiff must first establish a prima facie case of age discrimination. Once the prima facie case is established, a legal presumption of unlawful discrimination is created. <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 506 (1993). The burden of production then shifts to the defendant to articulate a legitimate non-discriminatory reason for the adverse employment action. If the defendant comes forward with a non-discriminatory explanation, the presumption of unlawful discrimination drops from the case. <u>Id</u>. at 511. The burden of production then returns to the plaintiff to rebut the defendant's

explanation by showing that the proffered reason is actually a pretext for intentional discrimination. Id. at 508. The burden of proof remains with the plaintiff at all times. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981).

In order to establish a prima facie case of age discrimination, plaintiff must establish that (1) she was at least 40 years of age, (2) she suffered an adverse employment action, (3) she was otherwise qualified for the position she held, and (4) the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination. Riley v. Lance, Inc., 518 F.3d 996, 1000 (8th Cir. 2008). The inference can be drawn by showing that similarly situated individuals under the age of 40, or substantially younger than plaintiff, were treated more favorably. See O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 313 (1996) ("Because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class").

There is no question that plaintiff was over 40 at the time she was terminated; she was 57.

106

Plaintiff alleges that she was terminated, which is an adverse employment action.

Plaintiff argues that because she had performed her duties for years, she has established the third prong of a prima facie case, citing Riley v. Lance, Inc., 518 F.3d 996, 1000 (8th Cir. 2008).  In that case, the court held that the district court erred in analyzing whether the plaintiff had been performing his job "at the level that met the employer's legitimate expectations."  The court held that the plaintiff "needed only to show that he was 'otherwise qualified' for the position he held.  Since he had been performing the DAM job successfully for years, he met that requirement of the prima facie case."  Id.

In this case, plaintiff held her position for several years, but it was in 2004 that her position changed to court administrator, she picked up zoning administrator duties, and she began working as a secretary to the Board of Adjustment and the Planning Commission.  Therefore, it cannot be said that she performed her duties "for years."  However, giving plaintiff the benefit of the doubt, I will find, for purposes of this summary judgment motion, that plaintiff has established that she was otherwise qualified for the position she held.

The final question is whether plaintiff can show that the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination.  Plaintiff

points to the fact that she was replaced by a 50-year-old woman after she, at 57, was terminated. Because this is not a reduction-in-force ("RIF") case, this showing is sufficient to satisfy this prong of the prima facie case. Being replaced by a younger individual in a non-RIF case supports a reasonable inference of age discrimination for purposes of establishing a prima facie case. Riley v. Lance, Inc., 518 F.3d 996, 1000-01 (8th Cir. 2008); Ward v. International Paper Co., 509 F.3d 457, 461 (8th Cir. 2007).

Because plaintiff has established a prima facie case, a legal presumption of unlawful discrimination is created. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993). The burden of production then shifts to the defendant to articulate a legitimate non-discriminatory reason for the adverse employment action.

Defendant presented evidence that plaintiff was terminated due to her personal use of city credit cards, "double dipping" in the payroll, and the generally poor conditions of Lake Lotawana's city records. These are clearly legitimate, non-discriminatory reasons for plaintiff's discharge. Because defendant has articulated a legitimate, non-discriminatory reason for plaintiff's discharge, the presumption of unlawful discrimination drops from the case. Id. at 511. The burden of production then returns to the plaintiff to rebut the defendant's explanation by

108

showing that the proffered reason is actually a pretext for intentional discrimination.  At the summary judgment stage, under the 1991 amendments to Title VII, the issue is "'whether the plaintiff has sufficient evidence that unlawful discrimination was a motivating factor in the  defendant's adverse employment action.'" <u>Roberts v. Park Nicollet Health Servs.</u>, 528 F.3d 1123, 1127 (8th Cir. 2008) (quoting <u>Griffith v. City of Des Moines</u>, 387 F.3d 733, 735 (8th Cir. 2004)).  If so, then "'the presence of additional legitimate motives will not entitle the defendant to summary judgment.'" <u>Id</u>.

In her response, plaintiff argues as follows:

As discussed in the pretext section above, the Defendants can not offer legitimate non-discriminatory reasons for Porter's termination. Further, the evidence reveals that the Defendants [sic] reasons for termination are pretext and not the real reasons for her termination, and coupled with the strength of Plaintiff's prima facie case, give rise to a logical inference of discrimination.  As such, even Defendants' version of the events raise [sic] genuine issues of material fact that would preclude the Court from entering summary judgment on Porter's claim of age discrimination.

I have read the pages cited by plaintiff as being her discussion on pretext, and I see no evidence that defendant's proffered reason for terminating plaintiff was based on plaintiff's age, in whole or in part.  Plaintiff directs the court to pages 40-43 of her response.  In those pages, plaintiff discussed retaliation and then states that "a reasonable factfinder could conclude that Defendants' proffered reasons for her adverse employment action are pretextual."  However,

109

plaintiff fails to articulate any evidence that defendant's decision to terminate her employment is based at all on illegal age discrimination.

The undisputed evidence in this case establishes that:

★ Plaintiff was 57 years of age at the time of her termination.

★ Plaintiff's supervisor, Art Van Hook, was 63 years of age at the time of plaintiff's termination.

★ At the time of plaintiff's termination, the ages of the three Aldermen who voted to terminate plaintiff were 49, 53, and 69.

★ At the time of plaintiff's termination, the ages of the three Aldermen who voted not to terminate plaintiff were 64, 65, and 72.

★ Prior to plaintiff's termination, a subordinate who complained about plaintiff's performance (Rhonda Littrell) was 50 years of age. Ms. Littrell, who was the deputy clerk when plaintiff was terminated, was subsequently appointed to the City Clerk position.

★ The Police Chief, whom plaintiff believes is a similarly situated employee, was 59 years of age when plaintiff was terminated. Patrick Pendergist, Director of the Public Works department, whom plaintiff believes is a similarly situated employee, was 58 years of age when plaintiff was terminated. Chief Poletis had a written contract setting forth his benefits. Plaintiff's salary was higher than Patrick Pendergist's.

★ In January 2006, Rhonda Littrell and Toni Burgess told plaintiff's supervisor, Art Van Hook, that plaintiff was not coming to work regularly, was not attending to the business of the city, and was using city credit cards for personal purchases.

★ After plaintiff was told about the complaints, she began yelling and screaming in the office every day.

★ In February 2006, Art Van Hook saw plaintiff's city Visa bill and told her not to make any more food purchases.

110

★ In March 2006, Art Van Hook observed a personal purchase on plaintiff's city Wal-Mart account, he confronted plaintiff, and she admitted she had made a personal purchase on the city's account.

★ On April 7, 2006, plaintiff attended a meeting with Van Hook and others. Van Hook gave plaintiff a memo which instructed her to immediately surrender her city credit card and to obtain complete records of all credit transactions with Wal-Mart on the City's account.

★ On April 20, 2006, plaintiff prepared a memo and said that while doing an internal audit, she discovered she had accidentally made personal charges on the city's credit card. She deposited $239.09 in the General Fund Account to cover personal purchases she had made in June 2005, September 2005, and December 2005.

★ Other purchases were made with plaintiff's city credit card in 2005 which were not city purchases, but plaintiff either denies having made them or failed to reimburse the city.

★ On May 3, 2006, Art Van Hook was told by Toni Burgess that plaintiff's anger and retaliation was causing serious problems in the office.

★ On May 24, 2006, the Board of Aldermen voted to appoint plaintiff as City Clerk for one year.

★ On May 25, 2006, plaintiff was placed on paid leave, and she was informed that the city was retaining an outside agent to investigate payroll/time card discrepancies, unauthorized paid vacation, unauthorized compensatory time, questionable credit card transactions, improper city records maintenance, and unauthorized sewer billing adjustments (which stemmed from plaintiff's becoming involved with a delinquent sewer bill of her husband's attorney).

★ While on leave, plaintiff was paid her normal salary but not the additional money she had been getting for performing extra duties.

★ While she was on leave, plaintiff was asked by Van Hook to provide answers to a list of questions so he could pay the city's employees. Plaintiff did not respond, and Van Hook believed that amounted to insubordination. Plaintiff offered to answer the questions in a meeting with an

111

attorney present, but Mayor Van Hook did not set up such a meeting.

★ Prior to plaintiff's termination, Van Hook learned that plaintiff had been using money in the city's sewer fund to pay general fund obligations.

★ On July 26, 2006, plaintiff wrote a letter to the City Attorney claiming to be a victim of age and gender discrimination. The City Attorney received the letter on Friday, July 28, 2006. Mayor Van Hook was not made aware of this letter until after plaintiff's termination.

★ On July 28, 2006, Van Hook and the Board of Aldermen were told that there were a lot of "red flags" which included misuse of city credit cards.

★ On Monday, July 31, 2006 -- the next business day after the Board of Aldermen received the "red flag" report from the outside accounting firm, three of the six Aldermen voted to discharge plaintiff, and Mayor Van Hook cast the deciding vote to terminate her.

★ The outside accountant also reviewed spending records of the Police Department and the Public Works Department and had "insignificant" concerns about the Police Department and no concerns about the Public Works Department.

★ At some point, Mayor Van Hook blamed the failure to make payroll in June 2006 on not having the answers to the questions he posed to plaintiff while she was on leave. However, there is no mention of potential payroll problems in any of the minutes of the City Aldermen meetings that were held on May 24, 2006; June 6, 2006; or June 20, 2006.

★ Plaintiff believes Mayor Van Hook was using her as his scapegoat because things were really screwed up and he was looking for someone to blame it on; that he was using her as a scapegoat for the problems caused by the city's annexation; that the reason she was discharged was because Mayor Van Hook "pissed away" the city's money and needed someone to blame it on; and that the reason she was discharged was because Mayor Van Hook was afraid he would be impeached and he needed someone to blame.

There simply is no evidence that the city's legitimate, non-discriminatory reason for discharging plaintiff was a pretext for

112

unlawful age discrimination.  Even plaintiff's own beliefs are
that she was Mayor Van Hook's scapegoat, not that she was
discharged because of her age.

> In determining whether defendants' legitimate non-
> discriminatory explanation for their decision to discharge
> the plaintiff is pretextual, you may not second guess
> defendants' business decision nor question the means they
> used to achieve a legitimate goal. Further, under the law,
> defendants have the right to terminate an employee's
> services for a good reason, a bad reason, or for no reason
> at all, as long as their reason for discharging the
> plaintiff is not the plaintiff's age.

Dupre v. Fru-Con Engineering, Inc., 112 F.3d 329, 335 (8th Cir.

1997).  See also McLaughlin v. Esselte Pendalflex Corp., 50 F.3d

507, 511-512 (8th Cir. 1995):

> Although Title VII tolerates no discrimination whether
> subtle or otherwise, this circuit has also acknowledged that
> employers have wide latitude to make business decisions.
> "[A]n employer has the right to ... assign work, to change
> an employee's duties, to refuse to assign a particular job,
> and to discharge--for good reason, bad reason, or no reason
> at all, absent intentional ... discrimination." Walker v.
> AT & T Phone Ctr., Inc., 995 F.2d 846, 849-50 (8th Cir.
> 1993); Neufeld v. Searle Laboratories, 884 F.2d 335, 340
> (8th Cir. 1989) (recognizing that "courts have no business
> telling [companies] how to make personnel decisions, which
> may be objectively or subjectively based"); Smith v.
> Monsanto Chem. Co., 770 F.2d 719, 723 n. 3 (8th Cir. 1985)
> (recognizing that an employer may develop arbitrary,
> ridiculous and even irrational policies as long as they are
> applied in a nondiscriminatory manner), cert. denied, 475
> U.S. 1050 (1986). Furthermore, the Supreme Court has stated
> that "the fact that a court may think that the employer
> misjudged the qualifications of the applicants does not in
> itself expose [the employer] to Title VII liability...."
> Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248,
> 259 (1981). It is not sufficient for McLaughlin to raise an
> issue regarding whether it was a wise decision to transfer
> her. She meets her burden only if she can present evidence
> that would allow a reasonable jury to conclude that the
> decision was based on her gender.

113

Based on all of the above, I find that plaintiff is unable to establish her burden of proving that her age was a motivating factor in the defendants' decision to terminate her employment. Therefore, defendants' motion for summary judgment on plaintiff's claims of age discrimination will be granted.

**B.    *SEX DISCRIMINATION CLAIM***

Title VII provides that it shall be unlawful for an employer "to discharge any individual, or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).

Because there is no direct evidence of sex discrimination, the burden-shifting scheme developed by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies to this case.  Therefore, plaintiff must first establish a prima facie case of sex discrimination.  Once the prima facie case is established, a legal presumption of unlawful discrimination is created.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).  The burden of production then shifts to the defendant to articulate a legitimate non-discriminatory reason for the adverse employment action.  If the defendant comes forward with a non-discriminatory explanation, the presumption of unlawful discrimination drops from the case.  Id. at 511.  The burden of production then returns to the plaintiff to rebut the defendant's

114

explanation by showing that the proffered reason is actually a pretext for intentional discrimination.  Id. at 508.  The burden of proof remains with the plaintiff at all times.  Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981).

In order to establish a prima facie case of sex discrimination, plaintiff must establish that (1) she is a member of a protected group; (2) she was qualified for her position; (3) she was discharged; and (4) the discharge occurred under circumstances giving rise to an inference of discrimination."  Pope v. ESA Services, Inc., 406 F.3d 1001, 1008 (8th Cir. 2005).  Plaintiff can prove the fourth element by putting forth facts that similarly situated employees who are not female were treated differently.  Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 851 (8th Cir. 2005); Wheeler v. Aventis Pharms., 360 F.3d 853, 857 (8th Cir. 2004).

There is no question that plaintiff was female, was otherwise qualified for her position, and was discharged.  Plaintiff argues that she was fired under circumstances giving rise to an inference of discrimination, i.e., that she was placed on administrative leave by Mayor Van Hook; Van Hook improperly launched an investigation of plaintiff and not the other two department heads who are male; one of the male department heads used a city credit card for personal use without reprimand;

115

plaintiff did not receive the same vacation time, sick time, and comp time as the two male department heads; and all of the city budget and managerial duties were assumed by a male at a substantially higher salary.

Plaintiff's first suggestion, that she was placed on administrative leave, has nothing to do with gender and therefore cannot establish the fourth prong of the prima facie case. The question is whether the remaining suggestions are sufficient to establish an inference of sex discrimination.

The Eighth Circuit, in Rodgers v. U.S. Bank, N.A., 417 F.3d 845 (8th Cir. 2005), discussed the conflicting cases and the proper standard for establishing the fourth element of the prima facie case:

> There appear to be conflicting lines of cases in our Circuit regarding the standard for determining whether employees are similarly situated at the prima facie stage of the McDonnell Douglas burden-shifting framework. One line sets a "low threshold" for employees to be considered similarly situated, requiring only that the employees "are involved in or accused of the same or similar conduct and are disciplined in different ways." See Wheeler [v. Aventis Pharms.], 360 F.3d [853], 857 [8th Cir. 2004]] (citing Williams v. Ford Motor Co., 14 F.3d 1305, 1308-09 (8th Cir. 1994), the Court reasoned that at the prima facie stage the test for determining whether employees are similarly situated "is 'not onerous,' however at the third stage (proving pretext) it is 'rigorous'"); see also Williams, 14 F.3d at 1309 n. 3 (noting that the meaning of "similarly situated" varies, depending on whether it is applied at the prima facie stage or pretext stage). The other line, upon which the district court relied, is more rigorous at the prima facie stage and requires that the employees must be "similarly situated in all respects." See Gilmore [v. AT&T], 319 F.3d [1042,] 1046 [(8th Cir. 2003)] (citing Clark [v. Runyon], 218 F.3d [915,] 918 [(8th Cir. 2000)]. (FN:

116

<u>Gilmore</u> relied on <u>Clark v. Runyon</u>. . . . However, <u>Clark</u>'s use of a more rigorous standard at the prima facie stage appears misplaced. For example, <u>Clark</u> relied on <u>Harvey v. Anheuser-Busch, Inc.</u>, 38 F.3d 968 (8th Cir. 1994), and <u>Lynn v. Deaconess Medical Center</u>, 160 F.3d 484 (8th Cir. 1998). . . . <u>Harvey</u> and <u>Lynn</u>, however, used the more rigorous "similarly situated in all relevant respects" standard at the pretext stage, not the prima facie stage.)

                    * * * * *

When there are conflicting lines of cases in our Circuit, we can choose which line to follow. . . .

At the prima facie stage of the <u>McDonnell Douglas</u> burden-shifting framework, we choose to follow the low-threshold standard for determining whether employees are similarly situated. We believe this more accurately reflects Supreme Court precedent. The Supreme Court has advised: "The burden of establishing a prima facie case of disparate treatment is not onerous." <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981). We also think that using the low-threshold standard at the prima facie stage is more in line with our Court's prior admonition that "[t]he district court must not conflate the prima facie case with the ultimate issue of discrimination. . . . Using a more rigorous standard at the prima facie stage would "conflate the prima facie case with the ultimate issue of discrimination," thereby effectively eliminating the burden-shifting framework the Supreme Court has directed us to use.

Using this very lenient standard, I find that plaintiff's allegations that one of the male department heads used a city credit card for personal use without reprimand; and plaintiff did not receive the same vacation time, sick time, and comp time as the two male department heads establishes the fourth prong of the prima facie case, since the undisputed facts support at least these undetailed allegations. However, the allegations that Mayor Van Hook improperly launched an investigation of plaintiff and not the other two department heads who are male and all of

117

the city budget and managerial duties were assumed by a male at a substantially higher salary are not supported by the evidence. The undisputed evidence does not establish that there was anything improper about the investigation. Further, even plaintiff's proffered undisputed facts do not mention that the city budget and managerial duties were assumed by a male at a substantially higher salary. Therefore, there is no evidence (not even disputed evidence) in the record that this occurred.

Defendant presented evidence that plaintiff was terminated due to her personal use of city credit cards, "double dipping" in the payroll, and the generally poor condition of Lake Lotawana's city records. These are clearly legitimate, non-discriminatory reasons for plaintiff's discharge. Because defendant has articulated a legitimate, non-discriminatory reason for plaintiff's discharge, the presumption of unlawful discrimination drops from the case. Id. at 511. The burden of production then returns to the plaintiff to rebut the defendants' explanation by showing that the proffered reason is actually a pretext for intentional discrimination. At the summary judgment stage, under the 1991 amendments to Title VII, the issue is "'whether the plaintiff has sufficient evidence that unlawful discrimination was a motivating factor in the defendant's adverse employment action.'" Roberts v. Park Nicollet Health Servs., 528 F.3d 1123, 1127 (8th Cir. 2008) (quoting Griffith v. City of Des Moines, 387

118

F.3d 733, 735 (8th Cir. 2004)).  If so, then "'the presence of additional legitimate motives will not entitle the defendant to summary judgment.'" Id.

Plaintiff's evidence of pretext consists of the fact that one of the male department heads used a city credit card for personal use without reprimand; and plaintiff did not receive the same vacation time, sick time, and comp time as the two male department heads.

At the pretext stage of the McDonnell Douglas burden-shifting framework, the test for determining whether employees are similarly situated to a plaintiff is a rigorous one.  Rodgers v. U.S. Bank, N.A., 417 F.3d at 853.  Plaintiff must show that she and the employees outside of her protected group were similarly situated in all relevant respects.  Id.  To be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of "comparable seriousness."  Id. quoting Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972-73 (8th Cir. 1994); Lanear v. Safeway Grocery, 43 F.2d 298, 301 (8th Cir. 1988).  Although two employees may violate the same company policy, the frequency and seriousness of the violations and any suspicious circumstances surrounding the violations must be the same to qualify as similarly situated employees.  Rodgers v. U.S. Bank, N.A., 417 F.3d at 853-54.

119

In <u>Rodgers v. U.S. Bank, N.A.</u>, 417 F.3d 845 (8th Cir. 2005), Rodgers claimed that several other white employees were put on notice for violating the bank's dual-control vault security policy, and that a white branch manager was demoted and given written warnings for poor performance and behavior issues rather than being terminated. The court found that Rodgers had not shown that she was similarly situated to any of those employees.

> "[W]hile Rodgers and Nichols violated the same bank policy, the degree and frequency of Rodgers's violations different significantly from that of Nichols's single violation. The district court compared Rodgers's nine transactions involving erroneous credits in excess of $650,000 to Nichols's one erroneous transaction involving 1,200. The district court agreed with U.S. Bank that the circumstances surrounding Rodgers's transactions were suspicious. Accordingly, the district court held that "[i]t therefore cannot be said that Rodgers and Nichols 'engaged in the same conduct without any mitigating or distinguishing circumstances.'"

<u>Id</u>. at 851.

I find that plaintiff cannot establish pretext using the strict standard required at this step of the burden-shifting analysis. The undisputed evidence establishes that plaintiff made personal purchases using the city credit card on June 5, 2005, for $97.06; one on September 5, 2005, for $46.39; and one on December 21, 2005, for $95.64. Plaintiff did not pay the city back for these purchases until April 20, 2006, and did not admit to making these personal charges until after she had been asked to turn over her city credit card because of improper purchases. In addition, a purchase was made on September 16, 2005, with

120

plaintiff's city credit card that plaintiff agrees was not a legitimate city purchase but which she denies having made herself. A purchase was made on July 25, 2005, on plaintiff's city credit card which plaintiff agrees contains items that are not legitimate city purchase and plaintiff has never reimbursed the city for the cost of those items. A purchase was made on plaintiff's city credit card for rubber ducks, and plaintiff gave rubber ducks as a Christmas gift shortly thereafter. The outside accountant discovered evidence that plaintiff had used her city credit card to purchase liquor, jewelry, food, and a blouse. The outside accountant indicated that plaintiff's misuse of city credit cards was an "obvious red flag."

Three of the Board of Aldermen voted to discharge plaintiff due to her personal use of city credit cards. Although another Alderman who voted not to discharge plaintiff, she did, herself, find evidence of wrongdoing by plaintiff. This Alderman, Lenda Harter, conducted her own investigation of the two male department heads named by plaintiff as similarly situated employees. Ms. Harter found no wrongdoing by the Public Works Director. She did find spending irregularities by Police Chief Poletis and brought those to the attention of Mayor Van Hook and the Board of Aldermen. The outside accountant had also looked at the credit card records of these two men and found no problems. Alderman Pfefferkorn believed that Police Chief Poletis had used

121

the city credit card for business trips and that those purchases were legitimate. There was no evidence presented that Chief Poletis used city credit cards for personal purchases the way plaintiff did.

Based on the undisputed evidence in the record, plaintiff cannot establish that she was similarly situated to either male department head because neither had violations similar to plaintiff's. Furthermore, the undisputed evidence establishes that plaintiff believes Mayor Van Hook was using her as his scapegoat because things were really screwed up and he was looking for someone to blame it on; that he was using her as a scapegoat for the problems caused by the city's annexation; that the reason she was discharged was because Mayor Van Hook "pissed away" the city's money and needed someone to blame it on; and that the reason she was discharged was because Mayor Van Hook was afraid he would be impeached and he needed someone to blame. None of this has anything to do with plaintiff's sex. D. J. Harter and Lenda Harter, two of the Aldermen who voted not to discharge plaintiff, believed that Mayor Van Hook wanted to fire plaintiff to make her a scapegoat for Lake Lotawana's financial problems. This has nothing to do with plaintiff's sex.

"[T]he employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business

judgments made by employers, except to the extent that those judgments involve intentional discrimination." <u>Rodgers v. U.S. Bank, N.A.</u>, 417 F.3d at 854; <u>Hutson v. McDonnell Douglas Corp.</u>, 63 F.3d 771, 781 (8th. Cir. 1995). Although it may not have been fair that plaintiff was terminated, the undisputed evidence establishes that she was not terminated because of her sex.

Plaintiff also argues that she was not provided with the same vacation time, sick time and compensatory time as the two other male department heads. The undisputed evidence establishes that plaintiff's salary was higher than that of Public Works Director Patrick Pendergist, and that Police Chief Poletis had an employment contract with the city but plaintiff did not. In addition, as discussed above, plaintiff is unable to show that she is similarly situated with the Police Chief or the Director of Public Works as her performance was markedly different than theirs given the credit card purchases discussed above.

Based on all of the above, I find that plaintiff is unable to establish that the defendants' legitimate non-discriminatory reason for its adverse employment actions was a pretext for unlawful sex discrimination. Therefore, defendant's motion for summary judgment on plaintiff claim of sex discrimination will be granted.

Case 4:07-cv-00461-REL   Document 131   Filed 03/31/09   Page 123 of 137

*C.    RETALIATION*

Plaintiff argues that she was terminated in retaliation for her reporting discriminatory acts of defendants.

In order to establish a prima facie case of retaliation, the plaintiff must show that (1) she participated in a protected activity, (2) that her employer took an adverse employment action against her, and (3) that a causal connection exists between the two.  Haas, 409 F.3d at 1036-37 (citing Herrero v. St. Louis Univ. Hosp., 109 F.3d 481, 485 (8th Cir. 1997)).

Plaintiff's maintains she was terminated in retaliation for making a written complaint of discrimination on July 26, 2006 (Doc. No. 71, at 42).  She argues that the city attorney, Jim Cook, received her letter alleging discrimination on Friday, July 28, 2006, and that she was terminated on Monday, July 31, 2006. Specifically she argues, "The letter was received by the City on Friday, July 28, 2006. [FN:  An attorney is an agent for his or her client.  Notice served upon an attorney is considered 'notice of all facts.'  Therefore, Lotawana was on notice as of July 28, 2006, that Porter engaged in a protected activity when Porter informed the Lotawana City Attorney, Jim Cook of her discrimination, wage and retaliation complaints against the city."] Porter was terminated within the following business day of the City receiving the letter, July 31, 2006.  Jim Cook, the

City Attorney who received the letter was present at the vote to terminate Porter." (plaintiff's response at page 42).

Plaintiff, in her own proposed undisputed facts, did not offer any proposed fact or any evidence that Jim Cook was present at the vote to terminate plaintiff. That allegation is completely unsubstantiated. Further, plaintiff's reliance on Link v. Wabash R. Co., 370 U.S. 626, 633-34 (1962), for the proposition that delivering a letter to the city attorney means that the Board of Aldermen and the Mayor are deemed aware of its contents is misplaced. In Link, the district judge sua sponte dismissed a lawsuit for failure to prosecute. The case stemmed from a car accident and was still pending six years later. The judge notified the attorneys of a pretrial conference, and the plaintiff's attorney failed to show up for the conference. Instead, he called the court, told the judge's staff that he was working on some papers, and that he could come another day but not that day. The Supreme Court upheld the dismissal:

> There is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client. Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have "notice of all facts, notice of which can be charged upon the attorney."

125

<u>Id</u>.  The situation with the delivery of plaintiff's letter is not
"representative litigation", and the city did not choose the City
Attorney "as [its] representative in the action".  There was no
action, and the City Attorney was not representing the City in
connection with plaintiff's claims of discrimination.

At the time plaintiff wrote the letter complaining of
discrimination, she had already been suspended and was being
investigated for the very acts for which she was terminated.
Simply delivering a letter to a city attorney does not establish
a causal connection between the complaints in the letter and a
subsequent termination.  Based on the undisputed facts, I find
that plaintiff is unable to establish a causal connection between
her termination and the letter she wrote complaining of
discriminatory treatment.  Therefore, defendant's motion for
summary judgment on her claim of retaliation will be granted.

**D.    MHRA**

**1.    DEFENDANT LAKE LOTAWANA**

A plaintiff's claim under the MHRA is analyzed under the
same standards as Title VII and ADEA claims.  <u>See</u>, <u>e.g.</u>, <u>Weger v.</u>
<u>City of Ladue</u>, 500 F.3d 710, 717 n.4 (8th Cir. 2007); <u>EEOC v.</u>
<u>City of Independence</u>, 471 F.3d 891, 894 (8th Cir. 2006)("MHRA
claim is analyzed under the same analysis as the ADEA claim").
Because defendant Lake Lotawana is entitled to summary judgment
on plaintiff's federal claims of age discrimination, sex

126

discrimination, and retaliation, it is likewise entitled to summary judgment on plaintiff's Missouri Human Rights Act Claim.

## 2.    *DEFENDANT VAN HOOK*

Defendant Van Hook moves for judgment on the pleadings on plaintiff's claim for violation  of the MHRA on two separate grounds.  First, defendant Van Hook argues that there is no individual liability under the MHRA.  Defendant Van Hook also argues that plaintiff failed to exhaust her administrative remedies before filing suit.

## 1.    *INDIVIDUAL LIABILITY*

Defendant Van Hook argues judgment on the pleadings should be granted on Count IV because an individual cannot be held liable under the MHRA.  In support of his argument, defendant Van Hook primarily relies on my opinion on <u>Jenkins v. Pfizer</u>, No. 06-0688-CV-W-REL, 2006 WL 2987673 (W.D. Mo. Oct. 17, 2006) and the principle of stare decisis.

In the <u>Jenkins</u> opinion I stated, "When a state's highest court has not addressed the precise question of state law that is at issue, a federal court must decide what the highest state court would probably hold were it called upon to decide the issue." <u>Jenkins</u>, 2006 WL 2987673, at *6.  I then relied on the Eighth Circuit's prediction in <u>Lenhardt v. Basic Institute of Technology, Inc.</u>, 55 F.3d 377, 380 (8th Cir. 1995), that the

127

Missouri Supreme Court would hold the MHRA did not confer individual liability. <u>Jenkins</u>, 2006 WL 2987673, at *6.

Since my opinion in <u>Jenkins</u>, there have been developments in Missouri state case law that suggest the Missouri Supreme Court would hold that individual liability exists under the MHRA. In <u>Cooper v. Albacore Holdings, Inc.</u>, 204 S.W.3d 238, 244 (Mo. App. 2006), the Missouri Court of Appeals for the Eastern District of Missouri held as a matter of first impression that "the MHRA imposes individual liability in the event of discriminatory conduct." Citing the <u>Cooper</u> decision, the Missouri Court of Appeals for the Eastern District of Missouri again held in <u>Brady v. Curators of the University of Missouri</u>, 213 S.W.3d 101, 113 (Mo. App. 2006), that the MHRA imposes individual liability. While the Missouri Supreme Court has yet to address the issue, I note that it has denied transfer in both the <u>Cooper</u> and <u>Brady</u> cases.

In <u>Cooper</u> the Missouri Court of Appeals discussed the Eighth Circuit's opinion in <u>Lenhardt</u> and noted, "[w]ith all due respect to the Eighth Circuit, the Missouri Supreme Court does not blindly follow the 'predictions' of the federal courts." 204 S.W.3d at 243 (<u>quoting</u> <u>Hill</u>, 324 F. Supp.2d at 1032)). This point is well taken. The <u>Lenhardt</u> opinion is nearly fourteen years old. The recent Missouri appellate court rulings suggest that were the Eighth Circuit to make a present prediction, it may

128

decide the Missouri Supreme Court would find individual liability existed under the MHRA. Indeed, since the <u>Cooper</u> and <u>Brady</u> cases were decided trial courts within the Eighth Circuit have declined to follow <u>Lenhardt</u>. See, e.g., <u>Anderson v. Ames True Temper, Inc., et al.</u>, No. 1:08-CV-30CAS, 2008 WL 697586, at \*2-\*3 (E.D. Mo. Mar. 13, 2008); <u>Chiu v. American Builders & Contractors Supply Co., Inc.</u>, No. 08-4002-CV-C-NKL, 2008 WL 922316, at \*1 (W.D. Mo. Apr. 1, 2008); <u>Cotton-Schrichte v. Peate, et al.</u>, No. 07-4052-CV-C-NKL, 2008 WL 3200775, at \*4 (W.D. Mo. Aug. 5, 2008); <u>Giandinoto v. Chemir Analytical Servs., et al.</u>, 545 F Supp. 2d 952, 959 (E.D. Mo. 2007); <u>Gronefeld v. City of Normandy, et al.</u>, No. 4:06 CV 386 DDN, 2007 WL 1452242, at \*10 (E.D. Mo. May 15, 2007); <u>Rose v. Wooten, et al.</u>, No. 06-4141-CV-C-WAK, 2006 WL 3511507, at \*1 (W.D. Mo. Dec. 5, 2006). As a result, plaintiff has stated a viable claim against defendant Van Hook in Count IV of her complaint.

Defendant Van Hook next maintains he is entitled to judgment on the pleadings because plaintiff did not obtain a "right-to-sue" letter prior to naming him as a defendant in this lawsuit. Specifically, plaintiff's September 15, 2006, Charge of Discrimination only identified defendant City of Lake Lotawana as the respondent. Plaintiff's "right-to-sue" letter, consequently, did not name defendant Van Hook.

As a general rule, a plaintiff must first timely file a charge of discrimination with the Missouri Commission on Human Rights and receive a "right-to-sue" letter before he or she may file suit under the MHRA.  Mo. Rev. Stat. §§ 213.075, 213.111.  See also Stuart v. Gen. Motors Corp., 217 F.3d 621, 630 (8th Cir. 2000).  This rule is not absolute, however.  The Eighth Circuit has held that administrative charges be construed liberally. Stuart, 217 F.3d at 631; Porter v. ABB Power T&D, Inc., No. 08-4166-CV-C-NKL, 2008 WL 4644584, at *2 (W.D. Mo. Oct. 20, 2008). The fact that an individual was not specifically named in the administrative charge does not preclude pursing a claim against the individual in court if such individual had adequate notice of the charge.  Hill v. Ford Motor Co., 324 F. Supp. 2d 1028, 1034 (E.D. Mo. 2004)(citing Greenwood v. Ross, 778 F.2d 448, 451 (8th Cir. 1985); Sedlacek v. Hach, 752 F.2d 333, 336 (8th Cir. 1985); Burrell v. Truman Med. Ctr., Inc., 721 F. Supp. 230, 233-34 (W.D. Mo. 1989)); Messmer v. Kindred Hosp. St. Louis, et al., No. 4:08-CV-749 CEJ, 2008 WL 4948451, at *3 (E.D. Mo. Nov. 10, 2008); Porter, 2008 WL 4644584, at *2.  This exception applies when the individual "not formally named" in the charge is "informally referenced in" the charge.  Porter, 2008 WL 4644584, at *2.

In this case, plaintiff's charge of discrimination only lists the City of Lake Lotawana, Missouri as a respondent (Doc. No. 28-8).  The particulars of the charge, however, reference

130

defendant Van Hook by title (i.e., mayor) and detail his participation in the alleged discrimination (Doc. No. 28-8). Applying the exception to the general rule that an individual must be specifically named in the administrative charge, I find that defendant Van Hook is not entitled to judgment on the pleadings on Count IV.

Defendant Van Hook raised the same argument in his motion for summary judgment on this count. See defendants' motion for summary judgment, p. 47, citing R.S. Mo. § 213.111. Plaintiff incorporates her response to Van Hook's motion for judgment on the pleadings wherein she states, "A set of facts that would show that Defendant Van Hook had adequate notice of the charge would constitute a recognized exception to the requirement that the party be named in the administrative charge. Plaintiff fully intends to prove such facts." Doc. 35, p. 5. Plaintiff failed to address the issue of Mayor Van Hook's notice of the charge of discrimination filed with the Missouri Human Rights Commission. As plaintiff is unable to establish that an exception exists to the requirement that plaintiff identify him as a respondent in her charge of discrimination, she has failed to exhaust her administrative remedies, and Art Van Hook is entitled to summary judgment on the Missouri Human Rights Act claim against him.

## E.    WRONGFUL DISCHARGE

Defendant Lake Lotawana argues that it is entitled to summary judgment on plaintiff's wrongful discharge claim because it has immunity from wrongful termination claims.  Plaintiff points out that by purchasing indemnity insurance, Lake Lotawana waived its sovereign immunity, citing R.S.Mo. § 537.610. Defendant correctly points out that Missouri Law has routinely held that the language of the insurance contract can effectively supersede § 537.610, allowing a city to purchase liability insurance without waiving sovereign immunity.  However, defendant failed to establish an undisputed fact with regard to the wording on the insurance contract in this case.  Therefore, because the language of the insurance contract remains in dispute, defendant Lake Lotawana's motion for summary on the wrongful termination claim will be denied.

Defendant Van Hook argues that he cannot be held liable for the wrongful discharge as he is not plaintiff's employer. Plaintiff argues that Van Hook tortiously interfered with an employment contract and acted beyond the scope of his employment by unilaterally setting about a course of events that lead to plaintiff's termination, both reasons that could lead to his individual liability.

Plaintiff does not have a contract and has not pled a breach of contract claim.  Furthermore, plaintiff's supervisor cannot be

132

held liable for tortious interference because it requires interference by a third party. Rice v. HODAPP, 919 S.W.2d 240 (Mo. banc 1996) (holding that supervisors cannot be held liable for tortious interference with a business relationship). Therefore, defendant Van Hook's motion for summary judgment on plaintiff's wrongful termination claim will be granted.

**F.    *DEFAMATION***

Plaintiff does not contest defendant's argument that Lake Lotawana cannot be held liable for defamation because "[s]overeign immunity immunizes government agencies". (Plaintiff's response, p. 52). See Mitchell v. Village of Edmundson, 891 S.W.2d 848, 850 (Mo. Ct. App. 1995).

The elements of a defamation claim include clear and convincing evidence of (1) publication, (2) of a defamatory statement, (3) that identifies the plaintiff, (4) that is false, (5) that is published with the requisite degree of fault, and (6) damages the plaintiff's reputation. State ex rel. BP Prods. N. Am. Inc. v. Ross, 163 S.W.3d 922, 929 (Mo. Banc 2005); M.A.I. 3.05. Publication is communication of defamatory matter to a third person. Dean v. Wissman, 996 S.W.2d 631, 633 (Mo. Ct. App. 1999). The doctrine of intra-corporate immunity provides that "communications between officers at the same corporation in the due and regular course of the corporate business or between different offices of the same business are not publications to

Case 4:07-cv-00461-REL   Document 131   Filed 03/31/09   Page 133 of 137

third persons." <u>Hellesen v. Kraus Trucklines, Inc.</u>, 30 S.W.2d 341, 344 (Mo. 1963). The doctrine is based on the legal premise that a corporation can only communicate through its employees in the regular course of business and distributed in the corporate structure, so that the corporation "is but communicating with itself." <u>Dean v. Wissman</u>, 996 S.W.2d at 634. The <u>Dean</u> court held that a public entity must "communicate within itself" the same as a private, for-profit corporation, and therefore intra-corporate immunity applies to public entities as well.

The defamatory statements are alleged to include the following:

a. In front of the board of Aldermen, that "The reason for this meeting is because Jane failed to receive an adequate insurance recovery amount on the police car that had been wrecked and was no longer serviceable". This statement was made by the mayor to the Board of Alderman. Therefore, the intra-corporate immunity doctrine applies to this statement.

b. Prior to her suspension that "Jane is under investigation" and that "it may go criminal". There is no evidence that this statement was false.

c. That a private citizen should not speak to plaintiff because "she was under investigation" and that "the company doing the investigation finds another problem each time a file is opened". There is no evidence that this statement was false.

134

d.    That "since Jane insisted to the Board of Aldermen the city annex all of the recent areas, problems were created by her over extending the city." There is no evidence that this statement was false.

e.    When asked why other city officials were not being investigated, defendant Van Hook responded, "Well, at least they did not steal any money from the city."  There is no evidence that this statement was made to a third party.

f.    In e-mail communications, "In case you haven't heard. . . Among other things, Mrs. Porter never registered the City's 1/8 cent sales tax with the State or County, consequently, we missed all 2006 road funds!"  The undisputed evidence establishes that plaintiff was the one who was responsible for registering the sales tax and that Lake Lotawana missed all of the 2006 road funds.  Therefore, plaintiff cannot establish that this communication is false.

g.    In e-mail communications, "Here's another one, R-56 and R-57 was replatted into one lot in October of 2004.  Mrs. Porter never sent it to the BOA!  Owner is not a happy camper....."  There is no evidence that this statement is false, or that it was published to a third party.

Because plaintiff cannot establish the requisite elements of a defamation claim on any of these statements, defendant Van

135

Hook's motion for summary judgment on the defamation count will be granted.

## G.   *BREACH OF FIDUCIARY DUTY*

Defendant Lake Lotawana argues that it is entitled to summary judgment as to liability on its breach of fiduciary duty claim.  The elements for breach of fiduciary duty include: "(1) the existence of a fiduciary relationship between the parties, (2) a breach of that fiduciary duty, (3) causation, and (4) harm." <u>Koger v. Hartford Life Ins., Co.</u>, 28 S.W.3d 405, 411 (Mo. App. 2000).  Because the issue of whether plaintiff breached her fiduciary duty remains disputed, Lake Lotawana's motion for summary judgment on this claim will be denied.

## VI.  *CONCLUSION*

For the reasons more fully stated above, it is

ORDERED that defendant Van Hook's motion for judgment on the pleadings is granted as to plaintiff's claims of age discrimination, sex discrimination, and retaliation.  It is further

ORDERED that defendant Lake Lotawana's motion for summary judgment on plaintiff's claims of age discrimination, sex discrimination, retaliation, the Missouri Human Rights Act, and defamation is granted.  It is further

136

ORDERED that defendant Lake Lotawana's motion for summary judgment on plaintiff's claim of wrongful discharge is denied. It is further

ORDERED that defendant Art Van Hook's motion for judgment on the pleadings as to plaintiff's claims of Missouri Human Rights Act violations and wrongful discharge are denied. It is further

ORDERED that defendant Art Van Hook's motion for summary judgment on plaintiff's claims of Missouri Human Rights Act violations, wrongful discharge, and defamation is granted. It is further

ORDERED that defendant Lake Lotawana's motion for summary judgment on its counterclaim of breach of fiduciary duty is denied.

This leaves for trial plaintiff's claim of wrongful discharge against Lake Lotawana and Lake Lotawana's counterclaim of breach of fiduciary duty against plaintiff.


*/s/ Robert E. Larsen*
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 31, 2009

137